**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF GEORGIA**
**(Brunswick Division)**

| | |
|---|---|
| _____ ) | |
| ) | **Case No. _____** |
| **Glynn-Brunswick Hospital Authority,** ) | |
| **Trading as Southeast Georgia Health** ) | |
| **System,** ) | |
| ) | |
| **Southeast Georgia Health System, Inc.** ) | |
| ) | |
| **Plaintiffs Individually** ) | **COMPLAINT - CLASS ACTION** |
| **and as Members of** ) | |
| **Classes** ) | |
| ) | **Sherman Act § 2** |
| ) | **15 U.S.C. § 2** |
| **v.** ) | |
| ) | **JURY TRIAL DEMANDED** |
| ) | |
| **Becton, Dickinson and Company** ) | |
| ) | |
| **Defendant.** ) | |
| ) | |
| _____) | |

**Table of Contents**

NATURE OF THE ACTION ......................................................................................1

PARTIES ....................................................................................................................3

JURISDICTION AND VENUE .................................................................................4

CLASS ACTION ALLEGATIONS ...........................................................................4

Class of Acute Care Purchasers of Becton Syringes ...........................................4

    A.    Federal Rule of Civil Procedure 23(a) Prerequisites ...................................4

    B.    Federal Rule of Civil Procedure 23(b)(3) Prerequisites ............................6

    C.    Federal Rule of Civil Procedure 23(b)(2) Prerequisites ............................6

Class of Acute Care Purchasers of Becton IV Catheters ......................................7

    A.    Federal Rule of Civil Procedure 23(a) Prerequisites ...................................7

    B.    Federal Rule of Civil Procedure 23(b)(3) Prerequisites ............................8

    C.    Federal Rule of Civil Procedure 23(b)(2) Prerequisites ............................9

RELEVANT MARKETS .............................................................................................9

Relevant Product Markets........................................................................................9

    A.    Relevant Product Market for Sale of Syringes to Acute Care Providers........................................................................................9

    B.    Relevant Product Market for Sale of IV Catheters to Acute Care Providers........................................................................................9

Relevant Geographic Markets................................................................................10

Becton's Market Power in the Relevant Market for Sale of Syringes to Acute Care Providers .......................................................10

    A.    Direct Evidence..............................................................................10

    B.    Circumstantial Evidence ................................................................11

i

Becton's Market Power in the Relevant Market for Sales of IV Catheters to Acute Care Providers ............................................................. 12

    A.    Direct Evidence .............................................................................. 12

    B.    Circumstantial Evidence ............................................................... 12

**EXCLUSIONARY CONDUCT TO SUPPRESS SYRINGE COMPETITION** ................... 13

Blood Pathogens Are Spread by Syringe Needlesticks and Reuse .................... 13

The Needlestick Safety and Prevention Act Is Enacted .................................... 14

Monopolist Becton Makes Minor and Ineffective "Safety" Changes (Often Increasing Risk) ..................................................................................... 14

Innovation Challenges Becton's Dangerous Monopoly ................................... 15

True to Form, Becton Responds with Six Exclusionary Schemes to Protect Its Monopoly ........................................................................................ 15

    Becton Is An Unrepentant Antitrust Recidivist ................................... 15

    Three Becton Contracts Effectively Suppress Syringe Competition ............. 17

        A.    Rebate Bundling to Penalize Severely Competitive Syringe Purchases ........................................................... 17

        B.    Penalty Contracts Also Raising the Costs of Competitive Purchases ............................................................ 18

        C.    Sole Source Contracts Denying Competitors Critical Distribution .............................................................. 20

    Becton Steals Competitive Technology to Protect Its Monopoly .................. 21

    Becton Uses Deception and False Advertising to Deny Competitors Market Share ................................................................................ 22

    Becton Extinguishes Safety Syringe Competition by Acquisition ................. 23

**EXCLUSIONARY CONDUCT TO SUPPRESS IV CATHETER COMPETITION** ........... 24

**ANTITRUST PRICE INJURY** ................................................................................. 24

**COST-PLUS DISTRIBUTION TO PLAINTIFF AND PROPOSED CLASSES**…………25

**STANDING**……………………………………………………………………………..27

**COUNT I**
    **Syringe Monopolization (Section 2 of the Sherman Act)**............................................ 29

**COUNT II**
    **IV Catheter Monopolization (Section 2 of the Sherman Act)**......................................29

**PRAYER FOR RELIEF**.......................................................................................................30

**JURY DEMAND**...................................................................................................................30

Plaintiffs individually and as proposed Class Representatives will show the Court as follows.

## NATURE OF ACTION

1.      For over a century the antitrust laws of the United States have sought to preserve free and unfettered competition. Competition secures for all an equal opportunity to engage in business and innovate. It helps ensure that markets deliver the lowest, competitive pricing, as well as safe and high quality products.

2.      Monopolist Becton, Dickinson and Company has systematically subverted innovation and competition for the sale of hypodermic syringes and IV catheters to United States hospitals ("acute care providers") for over a half century and monopolized the relevant markets in which they are sold.

3.      Nurses experience more than 600,000 needlesticks a year which can and do spread hepatitis B, hepatitis C, and Human Immunodeficiency Virus ("HIV"). As a consequence, syringes are the most dangerous devices used by acute care hospitals.

4.      Since 2001 federal law has mandated practices to reduce needlesticks from conventional syringes. Monopolist Becton, however, has lethargically and unhelpfully made only minor and ineffective changes to its conventional syringes (by adding needle shields and recapping) ("manual safety syringes").  Nonetheless, Becton proclaims these as "safe," "safety," or "safety-engineered." They do not materially reduce needlesticks and in some cases increase them dramatically. Just as importantly, they also do not prevent reuse of contaminated syringes.

5.      Becton's best-selling manual "safety" syringe is rated "unacceptable" by the Emergency Care Research Institute, one of the nation's most respected testing laboratories, in

1

part because it causes more needlesticks than conventional syringes. Barnes Jewish Christian HealthCare in St. Louis, as well as the hospitals of Duke University and Emory University, has reported similar danger. A national study using acute care data finds that manual safety syringes have "made absolutely no difference" in the incidents of needlesticks.

6.     Competition and innovation are the great drivers of American economic progress and safety. Here they have sought to compensate for monopolist Becton's dangerous lethargy. A small company, Retractable Technologies Inc., sells patented syringes which reduce needlesticks to a minimum. Its needles automatically retract into the barrel after patient extraction taking them out of harm's way.  Further, the syringes' plunger seals are also dislodged so that they cannot be used for a second injection (which could transmit contaminated blood). In marked contrast with the poor safety ratings of Becton's syringes, the Emergency Care Research Institute accords these syringes its highest possible safety rating.

7.     Rather than compete, and meet and improve upon Retractable's innovation on the merits using its vast resources to protect the national health, Becton has taken the low road of the repetitive antitrust scofflaw. Its integrated strategy to suppress competition and maintain its monopoly employs six schemes: (a) exclusionary bundled rebates (foreclosing acute care providers from effective competitive access to safer syringes), (b) penalty contracts and sole-source contracts to the same end, (c) theft of Retractable's innovative technology to use against it and greatly impede its market entry, (d) six years of competitive deception and false advertising, and (e) elimination of a significant safety rival by acquisition.

8.     Becton has also used many of the same schemes to obtain and maintain a monopoly in the market for the sale of IV catheters to acute care providers giving it, without much additional exclusionary effort, a second monopoly.

9.     Becton has long avoided honest competition. The United States Department of Justice has compelled Becton to agree to Consent Decrees on two occasions. These Decrees, two jury verdicts in actions brought by Retractable, a large settlement of another Retractable action brought at the turn of the century, and the acquisition of a large catheter rival (which itself recently paid anticompetitive kickbacks to standards agencies to gain competitive advantages) have cost Becton $485.6 million, including a treble-damage, lost-profit award to competitor Retractable. It is the law of this land, however, that purchasers of monopolized products, such as the United States hospitals represented here, are entitled to the greatest antitrust protection. Plaintiffs Glynn-Brunswick Hospital Authority, d/b/a Southeast Georgia Health System, and Southeast Georgia Health System, Inc. seek remedy for monopoly overcharging paid by acute care providers purchasing Becton's dangerous syringes, as well as its IV catheters. They seek to represent both a syringe and an IV catheter Class, each comprised of thousands of United States acute care providers purchasing Becton products.

## PARTIES

10.     Plaintiffs Glynn-Brunswick Memorial Hospital Authority, d/b/a Southeast Georgia Health System, and Southeast Georgia Health System, Inc. (collectively hereinafter "Health System" or "Plaintiff") operate two hospitals providing in-patient acute care in Brunswick and St. Marys, Georgia.  The Plaintiff serves patients in six counties in Southeast Georgia: Brantley, Camden, Charlton, Glynn, McIntosh, and Wayne. It operates here as well

family medicine centers, immediate care centers, senior care centers, and specialty care centers. It has purchased Becton syringes and IV catheters throughout the damage period. It also purchases such products from Becton for use by health care providers who are members of Cooperative Health Care Services, Inc.  Southeast Georgia Health System, Inc. is wholly owned by the Glynn-Brunswick Hospital Authority.

11.     Defendant Becton, Dickinson and Company is the largest manufacturer in the United States of hypodermic syringes and IV catheters.  It is a New Jersey corporation with its principal place of business in Franklin Lakes, New Jersey.

## JURISDICTION AND VENUE

12.     This Court has subject matter jurisdiction under 28 U.S.C. §§ 1337 (commerce and antitrust regulation) under Sections 2 of the Sherman Act (15 U.S.C. §§ 2), and Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15(a) and 26).

13.     Venue is proper because Becton resides within this judicial district as provided in 28 U.S.C. § 1391(b) and (c), and as provided in Sections 4 and 12 of the Clayton Act (15 U.S.C. §§ 15 and 22).

## CLASS ACTION ALLEGATIONS

### Class of Acute Care Purchasers of Becton Syringes

**A.      Federal Rule of Civil Procedure 23(a) Prerequisites**

14.     Plaintiff Health System ("Class Representative") is a representative of a Class of United States acute care providers purchasing Becton hypodermic syringes on or after July 17, 2011 under cost-plus distributor contracts under which the distributor is contractually required to pass on all of Becton's monopoly pricing ("Acute Care Syringe Class").  These cost-plus

4

contracts are "pre-existing," that is, they have been entered into before Becton's monopoly pricing is paid by the distributors and contractually passed on to the acute care providers. The distributor contracts pass on all monopoly overcharging no matter how much of the purchase volumes fixed under the contracts are actually purchased. "Acute care providers" include hospitals, hospital systems, and related facilities that perform surgery and other care on an in-patient basis. Purchases by or for these acute care providers are considered Class purchases whether or not they are used by the acute care providers for out-patient or in-patient services.

15.     Prosecution of the claims of the Class as a class action is appropriate because the prerequisites of Rule 23(a) of the Federal Rules of Civil Procedure are met:

(a)     The number of persons in the Class is in the hundreds, and the members of the Class are therefore so numerous that joinder of all members of the Class is impracticable. Joinder also is impracticable because of the geographic diversity of the members of the Class, the need to expedite judicial relief, and the Class Representative's lack of knowledge of the identity and addresses of all members of the Class.

(b)     There are numerous questions of law and fact arising from the pattern of Defendant's anticompetitive conduct which are common to the members of the Class. These include, but are not limited to, common issues as to (1) whether Becton has engaged in prohibited monopolization; and (2) whether the exclusionary conduct of Becton, taken as a whole, has allowed Becton to obtain and maintain market power allowing it to inflict antitrust price injury on members of the Class. In addition, there are common issues as to the nature and extent of the injunctive and monetary relief available to the members of the Class.

16.     The claims of the Class Representative are typical of the claims of the members of the Class and fairly encompass the claims of the members of the Class. The Class Representative and the members of the Class are similarly or identically harmed by the same systematic and pervasive concerted action.

17.     The Class Representative and its counsel will fairly and adequately protect the interests of the members of the Class. There are no material conflicts between the claims of the Class Representative and the members of the Class that would make class certification inappropriate. Counsel for the Class will vigorously assert the claims of the Class Representative and the other members of the Class.

**B.     Federal Rule of Civil Procedure 23(b)(3) Prerequisites**

18.     In addition, the prosecution of the claims of the Class as a class action pursuant to Rule 23(b)(3) is appropriate because:

(a)     Questions of law or fact common to the members of the Class predominate over any questions affecting only its individual members; and

(b)     A class action is superior to other methods for the fair and efficient resolution of the controversy.

**C.     Federal Rule of Civil Procedure 23(b)(2) Prerequisites**

19.     The prosecution of the claims of the Class as a class action pursuant to Rule 23(b)(2) is appropriate because Becton has acted, or refused to act, on grounds generally applicable to the Class, thereby making appropriate final injunctive relief, or corresponding declaratory relief, for the Class as a whole.

<u>**Class of Acute Care Purchasers of Becton IV Catheters**</u>

**A.      Federal Rule of Civil Procedure 23(a) Prerequisites**

20.      Plaintiff Health System ("Class Representative") is a representative of a Class of United States acute care providers purchasing Becton IV catheters on or after July 17, 2011 under cost-plus distributor contracts under which the distributor is contractually required to pass on all of Becton's monopoly pricing ("Acute Care IV Catheter Class"). These cost-plus contracts are "pre-existing," that is, they have been entered into before Becton's monopoly pricing is paid by the distributors and contractually passed on to the acute care providers. The distributor contracts pass on all monopoly overcharging no matter how much of the purchase volumes fixed under the contracts are actually purchased. "Acute care providers" include hospitals, hospital systems, and related facilities that perform surgery and other care on an in-patient basis. Purchases by or for these acute care providers are considered Class purchases whether or not they are used by the acute care providers for out-patient or in-patient services

21.      Prosecution of the claims of the Class as a class action is appropriate because the prerequisites of Rule 23(a) of the Federal Rules of Civil Procedure are met:

(a)      The number of persons in the Class is in the hundreds, and the members of the Class are therefore so numerous that joinder of all members of the Class is impracticable. Joinder also is impracticable because of the geographic diversity of the members of the Class, the need to expedite judicial relief, and the Class Representative's lack of knowledge of the identity and addresses of all members of the Class.

(b)     There are numerous questions of law and fact arising from the pattern of Defendant's anticompetitive conduct which are common to the members of the Class. These include, but are not limited to, common issues as to (1) whether Becton has engaged in prohibited monopolization and (2) whether the exclusionary conduct of Becton, taken as a whole, has allowed Becton to obtain and maintain market power allowing it to inflict antitrust price injury on members of the Class. In addition, there are common issues as to the nature and extent of the injunctive and monetary relief available to the members of the Class.

22.     The claims of the Class Representative are typical of the claims of the members of the Class and fairly encompass the claims of the members of the Class. The Class Representative and the members of the Class are similarly or identically harmed by the same systematic and pervasive concerted action.

23.     The Class Representative and its counsel will fairly and adequately protect the interests of the members of the Class. There are no material conflicts between the claims of the Class Representative and the members of the Class that would make class certification inappropriate. Counsel for the Class will vigorously assert the claims of the Class Representative and the other members of the Class.

**B.     Federal Rule of Civil Procedure 23(b)(3) Prerequisites**

24.     In addition, the prosecution of the claims of the Class as a class action pursuant to Rule 23(b)(3) is appropriate because:

(a)     Questions of law or fact common to the members of the Class predominate over any questions affecting only its individual members; and

(b)     A class action is superior to other methods for the fair and efficient resolution of the controversy.

### C.     Federal Rule of Civil Procedure 23(b)(2) Prerequisites

25.     The prosecution of the claims of the Class as a class action pursuant to Rule 23(b)(2) is appropriate because Becton acted, or refused to act, on grounds generally applicable to the Class, thereby making appropriate final injunctive relief, or corresponding declaratory relief, for the Class as a whole.

### RELEVANT MARKETS

### Relevant Product Markets

### A.     Relevant Product Market for Sale of Syringes to Acute Care Providers

26.     This market encompasses the sale of Becton hypodermic syringes for use by acute care providers. "Acute care providers" include hospitals, hospital systems, and related  facilities that  perform  surgery and other care  on  an  in-patient  basis (and possibly out-patient services as well). The  market  also  includes  the  syringes  of  Becton's  competitors  to which  acute  care providers  can  turn  for  alternative  supplies. "Syringes"  or  "hypodermic  syringes"  include conventional syringes, manual safety syringes, and retractable syringes.

### B.     Relevant Product Market for Sale of IV Catheters to Acute Care Providers

27.     This market consists of the sales of Becton IV catheters for use by acute care providers. "Acute care providers" include hospitals, hospital systems, and related  facilities  that perform  surgery and other care  on  an  in-patient  basis (and possibly out-patient services as well). The market also includes the IV catheters of Becton's competitors to which acute care providers can turn for alternative supplies. "IV Catheters" are devices used to deliver drugs or

fluids to a patient through an IV set. The IV catheters can be conventional or have a safety features.

**Relevant Geographic Markets**

28.     The relevant geographic markets for the sale of these relevant products encompasses the United States.

**Becton's Market Power in the Relevant Market
for Sale of Syringes to Acute Care Providers**

29.     There is both direct and circumstantial evidence of Becton's market power in the relevant market for the sale of syringes to acute care providers.

**A.     Direct Evidence.**

30.     Becton has consistently been able to charge above-competitive prices and make monopoly margins on the sale of its syringes. For example, the price differential between its and Retractable's 1 mL retractable syringe has been as high as 36%; and its pricing has been 22% to 33% higher than pricing for Covidien's manual safety syringes. Becton continues to maintain is market power and high market share notwithstanding its above-competitive pricing.

31.     Becton also has the capacity to exclude competition by rebate bundling contracts, penalty contracts, sole-source contracts, established deception and false advertising, established theft of patented technology, and the acquisition of rivals.

32.     Becton's ability to maintain its monopoly market share notwithstanding its manifestly poor syringe quality and safety record is further evidence of its market power.

10

**B.     Circumstantial Evidence.**

33.     Becton's market share and the competitive barriers to entry and expansion in the relevant market for sale of syringes to acute care providers comprise strong circumstantial evidence of Becton's market power and confirm direct evidence of such power.

34.     Becton's market share is over 70% by revenue. Its next largest competitor, Covidien, has only an approximate 17% share.

35.     The relevant market is characterized by high barriers to entry and expansion facing Becton's actual or potential competitors. It evidences substantial economies of scale requiring large production of syringes to reduce costs to lowest levels, the levels needed by competitors to be cost competitive with Becton.

36.     There are also regulatory barriers occasioned by patents and required FDA clearances. In addition, access to distribution through Group Purchasing Organizations ("GPOs") (*infra* ¶113) is critical for syringe sales by competitors. (Becton generates 75% of its revenues using this GPO distribution.) Becton's sole-source contracts deny these competitors access to a substantial amount of this necessary distribution.

37.     Further, Becton's rebate bundling contracts and penalty contracts pose very substantial barriers to competitive sales through any distribution channel.

38.     From 2004 to 2010 no Becton competitor with below one percent in market share rose to above one-and-one-half percent share.

**Becton's Market Power in the Relevant Market
for Sales of IV Catheters to Acute Care Providers**

**A.     Direct Evidence.**

39.     Becton has consistently been able to charge above-competitive prices and make monopoly margins in the relevant market for sale of IV catheters to acute care providers. It has charged as much as 37% more than Retractable's IV catheters, and 22% to 33% more than those of its next largest competitor, Covidien. Over a five-year period this monopoly pricing has lost it only approximately one percent in market share thereby making the pricing highly profitable and demonstrating market power.

40.     Becton also has the capacity to exclude its IV catheter competition by rebate bundling contracts, penalty contracts, and sole-source and dual-source contracts, and the acquisition of rivals.

41.     With exclusionary rebate bundling and other contracting practices Becton has used its wide range of sales of medical devices and its market power in the relevant market for the sale of syringes to acute care providers to exclude competition, gain market power and monopolize the relevant market for sale of IV catheters to acute care providers.

**B.     Circumstantial Evidence.**

42.     Becton's market share and the competitive barriers to entry and expansion in the relevant market for sale of IV catheters to acute care providers are also strong circumstantial evidence of Becton's market power.

43.     Becton's market share is over 65% by revenue.

44.     The relevant market is characterized by high barriers to entry and expansion facing Becton's actual or potential competitors. It evidences economies of scale requiring large

12

production of syringes to reduce costs to lowest levels, levels needed by competitors to be cost competitive with Becton.

45.     There are also regulatory barriers occasioned by patents and required FDA clearances. In addition, access to GPO distribution is critical for IV catheter sales. *See infra* ¶113.  Becton's sole-source contracts deny competitors access to this necessary distribution.

46.     Further, Becton's rebate bundling contracts and penalty contracts pose as well very substantial barriers to competitive sales through any distribution channel.

47.     From 2004 to 2010 all the small firms together in this relevant market had their shares rise only one-half of a percent and there was no successful entry or expansion even though Becton pricing has been well above competitors' pricing.

## EXCLUSIONARY CONDUCT TO SUPPRESS SYRINGE COMPETITION

### Blood Pathogens Are Spread by Syringe Needlesticks and Reuse

48.     For years acute care providers have been aware of the dangers posed by the hypodermic syringe. Conventional and manual safety syringes too often have created hundreds of thousands of needlestick injuries each year, injuries known to transmit to nurses deadly diseases such as hepatitis B, hepatitis C, and Human Immunodeficiency Virus ("HIV"). Further, the reuse of plastic syringe bodies with contaminated blood can and does transmit these diseases between patients.

49.     Training as to the use of poorly-engineered Becton conventional and manual safety syringes has not prevented the spread of blood pathogens in the often hectic, real world settings in which nurses use these syringes.

### The Needlestick Safety and Prevention
### Act Is Enacted

50.     The federal Needlestick Safety and Prevention Act forcefully brought to the fore

syringe safety issues. In 2000 it directed acute care providers among others to use safer practices

to reduce injury from "sharps" such as syringes and IV catheters.

### Monopolist Becton Makes Minor and Ineffective
### "Safety" Changes (Often Increasing Risk)

51.     With acute care providers demanding safer syringes to respect the law and protect

nurses and patients, monopolist Becton has made only minor and ineffective changes to its

conventional syringes (by adding needle shields and recapping) to produce "manual safety

syringes" which it markets as "safe," "safety," or "safety-engineered" syringes.

52.     Ironically these changes do not substantially reduce needlesticks and in some

cases has increased them. Nurses are stuck as they place a second hand on the Becton syringe to

activate the purported safety features after extraction. Indeed, some nurses refuse to engage the

safety features, considering the "safety" feature itself to be dangerous. Further, even if Becton

shield mechanisms operate to cover the needle, a contaminated syringe body can still be reused

allowing for the spread of disease.

53.     In October 1999, Becton's best-selling safety syringe, the SafetyLok, was rated

"unacceptable" by the Emergency Care Research Institute, one of the nation's most respected

testing laboratories, because it was found to increase needle sticks.

54.     Barnes Jewish Christian HealthCare in St. Louis converted to Becton's

SafetyGlide manual safety syringes and over a five-year period its needlestick injuries doubled

over those with conventional syringes. It thought it was buying Becton safety but purchased

instead more danger. Similar, unacceptable results have been reported at the hospitals of Duke University and Emory University.

## Innovation Challenges Becton's
## Dangerous Monopoly

55.     The innovative and much safer "VanishPoint" syringe made by Retractable Technologies Inc. has been brought to market to challenge Becton's dangerous monopoly. Its needle automatically retracts when removed from the patient into the syringe barrel taking it out of harm's way. Upon the retraction, the plunger seal of the syringe is dislodged so that the syringe cannot be used for a second injection of fluid.

56.     In contrast to Becton's poor safety ratings, the Emergency Care Research Institute gives this syringe its highest possible rating.

57.     The Children's Physicians Network (which has 35 clinics with over 400,000 visits a years) was unhappy about the number of needlesticks from Becton's conventional and manual safety syringes. It switched to retractable syringes and substantially eliminated the problem.

## True to Form, Becton Responds with Six Exclusionary
## Schemes to Protect Its Monopoly

### *Becton Is an Unrepentant Antitrust Recidivist*

58.     Becton responded to Retractable's innovation not with competitive vigor on the merits to match or improve upon Retractable's safety innovation, but with a raft of six exclusionary schemes suppressing remedial competition. In so doing it continued its long anticompetitive tradition spanning over a half-century.

59.     In 1964 Becton entered into a Consent Decree with the United States Department of Justice prohibiting the continuation of its monopolistic practices in the glass syringe market.

15

60.     In 2001 Retractable brought unfair competition and antitrust claims against Becton. *Retractable Techs., Inc. v. Becton, Dickinson and Co. et al.*, No. 5:01-cv-036 (E.D. Tex. filed Jan. 29, 2001). Becton settled these claims for $100 million.

61.     In 2007 Retractable felt compelled to bring a second suit alleging patent infringement, antitrust violations, false advertising and unfair competition. *Retractable Techs., Inc. v. Becton, Dickinson and Co. et al.*, No. 2:07-cv-250 (E.D. Tex., filed June 6, 2007). The patent claims were severed and the jury determined that Becton infringed (or stole) Retractable's patented technology for its innovative 1 mL retractable syringes, finding Becton liable for $5 million.

62.     In 2013 after an eight-day trial the jury sitting on Retractable's third lawsuit (the antitrust and false advertising claims severed from its patent claims) awarded Retractable $113.5 million in actual antitrust damages (exposing Becton to an automatic $340.5 million treble damage judgment) for attempted monopolization of safety syringes. *See Retractable Techs., Inc. v. Becton, Dickinson and Co. et al.*, No. 2:08-CV-16 (E.D. Tex.) (Docket No. 652, filed Nov. 10, 2014).

63.     Thus, in sum, over the last decade and one half Becton has paid, or will pay, to its most innovative syringe competitor $440.5 million on antitrust and patent infringement claims.

64.     Further, in 2014, its newly acquired subsidiary (formerly CareFusion Corporation) settled for $40.1 million a whistleblower suit with the United States Department of Justice. The Department claimed that Carefusion, now Becton, has paid $11.6 million in unlawful kickbacks to influence the Safe Practices Committee of the National Quality Forum to recommend and competitively promote CareFusion's products.

***Three Becton Contracts Effectively Suppress***
***Syringe Competition***

65.     Becton makes contract sales to acute care providers' distributors for sales to the acute care providers. The distributors provide the Becton syringes and IV catheters to the acute care providers under cost-plus contracts. *Supra* ¶¶14, 20 & *infra* ¶¶118-122.

66.     Some of the contracts linking Becton, distributors, and acute care providers are negotiated between Becton and group purchasing organizations ("GPOs") representing their member acute care providers. *Id.*

67.     The GPOs do not purchase or sell any products themselves. *Id.*

**A.     Rebate Bundling to Penalize Severely Competitive Syringe Purchases.**

68.     Becton is a large, diversified company, which sells a multitude of different medical devices to acute care providers. It exploits this diversity to implement a rebate bundling scheme making it very costly for acute care providers or their distributors to switch to competitive products so as to erode the Becton monopoly.

69.     Becton refuses to pay the substantial rebates on *all* its products purchased by an acute care provider (or its distributor) if it switches *any substantial amount* (typically 5% to 15%) of its historic syringe purchases from Becton to a competitor.

70.     Thus if a hospital switches for example 10% of its historic syringe buy from Becton it loses all rebates across the multiplicity of *the other bundled  Becton products it buys* (even if it buys 100% of its needs for all these other products). Such a stiff sanction makes the cost of switching to a syringe competitor (no matter how safe) very high and excludes competition on the merits.

17

71.     Becton's exclusionary rebate bundling is particularly effective because its syringe competitors, such as Retractable, have limited product lines which do not approach the range of the bundled Becton products. As a result, Retractable cannot compete because it is unable to offer as a syringe discount the global rebates its prospective buyer loses if it does business with Retractable.  Thus, even if Retractable substantially reduces its syringe pricing relative to that of Becton, this is not enough to make the sale.

72.     Indeed, one Texas hospital told it that if it bought even one box of Retractable syringes, the hospital would lose $300,000 in Becton rebates and incentives.

73.     Further, the Becton exclusionary bundling creates purchasing conflicts within hospitals. For example, if one department has a substantial needlestick risk and desires to move from Becton to protect its nurses and patients, such a shift penalizes the budgets (and possibly future services) of other departments desiring many of the unrelated Becton products. Thus the needlestick issues of the first department cannot be economically addressed to the detriment of its nurses and patients.

74.     Significantly, the exclusionary effect of these contracts is even greater because they are often multi-year contracts. Thus competition is frozen out for an extended period.

**B.     Penalty Contracts Also Raising the Costs of Competitive Purchases**

75.     As a second exclusionary scheme Becton employs contracts to penalize an acute care provider if it displays a lack of "loyalty" to the Becton syringe monopoly.

76.     They require an acute care provider to commit to buy its historic levels of syringe purchases (consistent with the Becton monopoly) or be offered Becton's worst ("Tier One") pricing. And this Tier One, penalty pricing has been going up over time.

18

77.     Typically the penalty contracts have four additional tiers of pricing. Tiers Two through Five provide better pricing as the annual volume of purchases goes up. Nonetheless, *all of these tiers* regardless of volume (and potential Becton cost savings) also require the acute care provider or its distributor to purchase 80% to 95% of the prior year's syringe volume ("market share maintenance commitment"). If this commitment is not met for any Tier then there are *no* end-of-year rebates *no matter how high the volume of purchases.* The provider gets the penalty Tier One pricing.

78.     Even an enormous buyer gets the penalty pricing if it is not "loyal" to the monopoly and its historic purchases. Yet another acute care provider receives substantial price reductions through rebates even if it buys a much smaller volume of Becton's syringes (and generates proportionately less volume cost savings for Becton), so long as it is loyal to the monopoly and its historic purchases.

79.     A hospital buying $5 million in syringes (consistent with Tier Five's most favored pricing) still receives the Tier One penalty pricing if it does not make its market share commitment. Thus the dollar amount of the penalty for not being "loyal" to the Becton monopoly and historic purchase levels goes *up not down* the more the customer buys. This not a pro-competitive volume discount but a monopoly protection scheme.

80.     Significantly, the exclusionary effect of these contracts is enhanced because the penalty contracts are often multi-year contracts. Thus competition for the monopoly is suppressed for an extended period.

81.     In sum, these penalty contracts are designed to maintain Becton's monopoly market share from year to year and make it very costly for an acute care provider to switch to competitive suppliers.

**C.     Sole Source Contracts Denying Competitors Critical Distribution.**

82.     Becton's third exclusionary scheme employs sole-source contracts with distributors and GPOs denying its syringe competitors critical distribution needed for vigorous price and quality competition.

83.     These contracts require that distributors handle only Becton syringes (or in some cases just Becton syringes and those of one other favored competitor, typically the second largest seller, Covidien). Thus small competitors such as Retractable are frozen out.

84.     This is analogous to having the biggest home seller in a local area enter into a contract with all the real estate brokers specifying they can only list that seller's homes and no one else's.

85.     Significantly, the exclusionary effect of these contracts is exacerbated by their multi-year terms which make the suppression of competition of a long standing nature.

86.     Also, as a variation on this scheme, Becton requires some distributors and GPOs to promote Becton syringes over competitive products. For example, Becton may require a distributor to pay its sales people more if they sell Becton products rather than those of competitors.

87.     Becton pays very large sums as "administration fees" according to sales volume of GPOs. The more syringes acute care members of the GPOs buy the more the GPOs are paid by Becton. Since Becton is by far the dominant seller of syringes (70% or more) its

administrative fees are a lucrative incentive for GPOs to exclude Becton competition with sole-source arrangements.

88.     According to a January 2005 report prepared by the United States Department of Health and Human Services Office of the Inspector General, over a four-year period, three of the largest GPOs collected approximately $1.8 billion in administrative fees, $500 million of which was used to pay the GPOs' operating costs. Of the remaining $1.3 billion revenue in excess of operating costs (*i.e.* profit), $898 million was distributed to the GPO members and $415 million stayed in the GPOs' coffers even though their operating costs had  been reimbursed.

89.     Thus, while the GPOs ostensibly are middlemen negotiating solely on behalf of their acute care members, they have potent incentive to help Becton maintain its monopoly and charge monopoly prices to their acute care members.

### Becton Steals Competitive Technology
### to Protect Its Monopoly

90.     Recognizing that Retractable's patented safety syringes effectively address the dangers  of needlesticks and syringe reuse, as well as pose a threat to its inferior syringes and its monopoly, Becton unlawfully has purloined this Retractable technology (as a fourth exclusionary scheme) and used it against Retractable in the marketplace. That is, Becton infringed Retractable's patents to introduce its own line of 1 mL "Integra" retractable syringes.

91.     Becton rushed these infringing syringes to market in 2002 to 2004 to block sales of innovative Retractable syringes and the erosion of Becton's market power.

92.     This theft by infringement has been established by a jury sitting in the Eastern District of Texans and affirmed on appeal. *Retractable Techs., Inc. v. Becton, Dickinson and Co.*,

21

653 F.3d 1296, 1307 (Fed. Cir. 2011). The doctrine of res judicata bars Becton from further contesting this anticompetitive infringement.

### Becton Uses Deception and False Advertising to
### Deny Competitors Market Share

93.     Becton has also employed a fifth scheme of exclusionary deception and false advertising to maintain its syringe monopoly.

94.     An East Texas jury has found that Becton engaged in deception and false advertising for over six years which "disparaged [Retractable's syringe] products and praised [Becton's]." *Retractable Technologies, Inc. v. Becton, Dickinson and Co.*, No. 2:08-CV-16 at 13 (E.D. Tex.) (Docket No.652, filed Sept. 19, 2013). This had the effect of suppressing the sales of the Retractable technology and thus prevented acute care providers from having full access to this safer innovative product. *See id.*

95.     The District Court enjoined two Becton claims to remove from the market the competitive "stain" of its false advertisements. Becton cannot claim now that its safety syringes "have the 'World's Sharpest Needle or any similar assertion of superiority in sharpness, or reduced patient pain as a result of needle sharpness." *Id.* at 15. It also must notify purchasers that its claims were false and that it did not have the data to prove its sharpness claim. *Id.*

96.     Significantly, in issuing the injunction the Eastern District credited Becton's own admission that its false needle sharpness claims allowed it to maintain "16% of its market share" and permitted it to maintain a "10-30% price premium versus competition." *Id.*

97.     Becton is estopped from further contesting these findings of deception and its admissions as to anticompetitive impact.

98.     Becton had also claimed that its syringes had less "dead space" between the needle and the syringe hub (containing medication that cannot be expelled from the syringe) than Retractable's syringes. High dead space can result in incorrect dosing and the waste of medication.

99.     The District Court also directed Becton to notify all its acute care customers, other purchasers, and GPOs that the "dead space" in Retractable safety syringes meets industry standards and that Becton had misrepresented that Rectractable's dead space was higher than that found on Becton's syringes. It enjoined Becton from advertising that its syringe products save more medication.

100.     Becton is estopped by the doctrines of res judicata and one-way estoppel from further contesting its anticompetitive deception and false advertising designed to gain competitive advantages over Retractable. Becton is estopped from further contesting that (a) it engaged in false or misleading statements of fact about the nature and quality of its own syringes or Retractable's syringes in commercial advertising or promotions over six years; (b) its statements deceived, or had the capacity to deceive, a substantial segment of potential purchasers; (c) its deception was material, that is, was likely to influence purchasing decisions; and (d) its  competitor Retractable either has been, or is likely to be, injured as a result of Becton's false statements.

### Becton Extinguishes Safety Syringe
### Competition by Acquisition

101.     Further, as a sixth scheme in its integrated strategy to suppress competition, Becton has also extinguished competition by purchasing a significant safety syringe rival.

102.   In 2012 it acquired Safety Syringes Inc. for $124 million. Safety Syringes' annual sales are approximately $100 million which are now added to Becton's already dominant syringe market share.

### EXCLUSIONARY CONDUCT TO SUPPRESS
### IV CATHETER COMPETITION

103.   The above paragraphs are incorporated herein by reference.

104.   By using rebate bundling contracts, penalty contracts, and sole-source contracts alleged herein Becton has also obtained and maintained market power over the relevant market for sale of IV catheters to acute care providers and monopolized this relevant market.

105.   These contracts allow Becton to greatly increase the costs facing acute care providers and their distributors wishing to purchase competitive IV catheters.   They allow Becton to exclude competition as well as charge the Acute Care IV Catheter Class above competitive pricing, as well as suppress competition as to product quality.

106.   In addition, Becton has extinguished competition in the relevant market by acquiring a primary IV catheter rival, CareFusion Corporation, a global, medical technology corporation. The acquisition is valued at $12.2 billion. CareFusion sells over $1 billion a year in "infusion systems" including "SurFlash" peripheral and other IV catheters.

107.   CareFusion, now Becton, settled in 2014 whistleblower claims with the United States Department of Justice that it paid millions in anticompetitive kickbacks to bodies setting safety standards to induce them to recommend and promote CareFusion products.

### ANTITRUST PRICE INJURY

108.   By employing  rebate bundling contracts, penalty contracts, sole-source contracts, theft of innovative safety technology, six years of advertising deception, and the acquisition of a

24

significant safety syringe rival Becton has maintained it market power in the relevant market for the sale of syringes to acute care providers throughout the United States and has monopolized this market.  It has used its market power to charge members of the Acute Care Syringe Class above-competitive pricing through the express pass-on requirements of their cost-plus distributor contracts and to deny acute care providers free, competitive access to innovative technology needed to combat the spread of deadly blood pathogens.

109.    Becton's most innovative competitor, Retractable, has been largely foreclosed from the relevant market.  Inferior and less safe conventional syringes and conventional manual safety syringes constitute more than 95% of syringes now used in acute care facilities.

110.    Further, by use of rebate bundling contracts, penalty contracts, sole-source contracts, and acquisition of a major rival, Becton has obtained and maintained market power in the relevant market for the sale of IV catheters to acute care providers throughout the United States. It has used this power to charge members of the Acute Care IV Catheter Class above-competitive pricing by the express requirements of their pass-on cost-plus distributor contracts and to suppress quality competition.

111.    For example, even though Retractable's VanishPoint IV catheters have been available since 2007, and priced approximately 30% less than Becton catheters, Retractable has been virtually locked out of this relevant market.

<b>COST-PLUS DISTRIBUTION TO PLAINTIFF<br>AND PROPOSED CLASSES</b>

112.    Plaintiff seeks to represent proposed Classes of acute care providers purchasing syringes and IV catheters under cost-plus distribution contracts. Becton has managed its contract

25

distribution through a multi-step process reflected in the arrangements under which it distributes to the Plaintiff.

113.    First Becton negotiates a "Net Dealer Contract" with Plaintiff's Group Purchasing Organization ("GPO"), Novation, LLC.  Novation does not buy or sell these products from Becton on behalf of its members.

114.    Instead, it notifies Plaintiff and its other members of the terms available under its Becton Net Dealer Contract after negotiated rebates or other discounts. Plaintiff then notifies Becton that it wishes to buy under the terms and conditions of the Novation contract.

115.    Plaintiff then negotiates with Owens & Minor a cost-plus distribution agreement under which Plaintiff receives the Becton/Novation terms plus Owens & Minor's fixed percentage mark-up of  those terms.

116.    Plaintiff then sends a "letter of commitment" to Becton notifying Becton that it has contracted with Owens & Minor and that Becton should charge Owens & Minor the pricing provided under the Novation contract.

117.    Becton then enters into a Dealer Notification Agreement with Owens & Minor defining terms and conditions of their relationship under the Novation contract for sales to Plaintiff.

118.    Plaintiff entered into its Owens & Minor contract on March 1, 2012 and committed to buy its syringes, IV catheters, and other healthcare supplies from Owens & Minor as its "prime vendor" for five years, that is, through March 1, 2017.  Under this contract Plaintiff purchases off a "Cost-Plus Distribution Schedule." Owens & Minor Agreement at 7. It agrees to purchase a "volume commitment" of not less than $7 million a year for syringes, IV catheters

26

and other healthcare supplies. Plaintiff pays a large penalty if it does not meet its annual volume commitment. *Id* ¶ 4.2 & Attachment A.

119.    Owens & Minor warrants that "Cost" under the "Cost-Plus Distribution Services Schedule"

> means the cost or expense incurred by O&M to procure the product (excluding from such calculation any discounts, fees and other incentives paid by suppliers [Becton] to O&M but including any manufacturer inbound freight and other manufacturer charges). The Cost of any product may be increased by the amount of any decrease in the discounts, fee and incentives by the supplier of the product either prior to or during the term of this Schedule.

*Id.* ¶ 4.1. The Cost is determined by the Novation GPO Net Dealer Agreement with Becton. If Novation subsequently obtains "better pricing and terms" Plaintiff may convert to such better pricing.  *Id. ¶* 4.4. Plaintiff receives the Becton/Novation rates for syringes and IV catheters at "base cost" plus a fixed percentage mark-up of 3.00% or 3.75%. *Id.* Owens & Minor Agreement Schedule A (Pricing).  In other distribution contracts with acute care providers the fixed, cost-plus mark-up may be referred to as a mark-up, line fee, or activity fee added to Becton/GPO or other pricing to the distributor.

## STANDING

120.    The Plaintiff and acute care members of the proposed Classes purchase the relevant products under cost-plus contracts. They have constitutional and statutory standing to assert monopolization against Becton because they have suffered antitrust price injury by paying above-competitive pricing as a result of Becton's monopolization of the syringe and IV catheter relevant markets.  Under their cost-plus distributor contracts, which are executed before any of the relevant purchases, the Class acute care providers have paid the above-competitive Becton pricing, not their distributors. The latter are contractually required to pass on to the acute care

providers *all* of this above-competitive pricing along with fixed contractual dollar or percentage mark ups (here a percentage mark-up) on an order-by-order basis. Thus the distributors do not absorb any of the unlawful overcharging at issue here and the full claims reside with the acute care providers.

121.    The United States Supreme Court has specified that, in general, only direct purchasers from a monopolist (here distributors) have standing to sue for monopoly overcharging in part because of the difficulty of tracing how much of this overcharging is paid by end users at the end of the chain of distribution.[1]  That is, it may be difficult to trace how much overcharge injury is borne by distributors and other intermediaries in the chain, as opposed to the end users at the end of the chain.

122.    However, in the same precedent articulating this direct purchaser rule, the Court clearly and explicitly created an exception allowing indirect purchasers such as the acute care providers here to assert claims where they purchase under express cost-plus distributor contracts existing before the purchases are made.  Where all monopoly overcharging is passed on by virtue of formal and explicit contractual requirements on an order-by-order basis the difficulties and complexities associated with tracing which firm bears monopoly overcharging do not occur. Distributors suffer no overcharge injury so the claims reside with the end users. Under the pre-existing contracts alleged here all unlawful overcharging is passed on to the acute care providers by contract on a unit-by-unit basis regardless of the amount of product purchased under a purchase order. The acute care providers are typically locked in to purchase a fixed volume of syringes, IV catheters or other healthcare supplies from Becton or suffer large penalties.

---

[1] *Illinois Brick v. Illinois*, 431 U.S. 720, 735-36 (1977).

## COUNT I

### Syringe Monopolization
### (Section 2 of the Sherman Act)

123.    All foregoing paragraphs are incorporated herein by reference.

124.    By virtue of its demonstrated ability to control pricing or exclude competition, its dominant market share, and the high barriers to competitive entry and expansion, Becton has market power in the relevant market for the sale of syringes to acute care providers. Its market share exceeds 70%.

125.    As a part of its integrated strategy to maintain market power in this relevant market, Becton has willfully engaged in at least six exclusionary schemes.

126.    As a consequence of its conduct, Becton has caused substantial antitrust price injury and actual damages to members of the Acute Care Syringe Class, as well as denied them competitive choice and quality competition.

127.    Becton's conduct is unlawful under Section 2 of the Sherman Act, 15 U.S.C. § 2.

## COUNT II

### IV Catheter Monopolization
### (Section 2 of the Sherman Act)

128.    All foregoing paragraphs are incorporated herein by reference.

129.    By virtue of its demonstrated ability to control pricing or exclude competition, its dominant market share, and the high barriers to competitive entry and expansion, Becton has market power in the relevant market for the sale of IV catheters to acute care providers.

130.    As part of its integrated strategy to obtain and maintain market power, Becton has willfully engaged in at least four exclusionary schemes.

29

131.    As a consequence of its conduct, Becton has caused substantial antitrust price injury and actual damages to members of the Acute Care IV Catheter Class, as well as denied them competitive choice and quality competition.

132.    Becton's conduct is unlawful under Section 2 of the Sherman Act, 15 U.S.C. § 2.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff individually and as a member of the two Classes alleged prays that:

A.    This Court declare that Defendant's conduct constitutes violations of the Sherman Act, 15 U.S.C. § 2.

B.    This Court permanently enjoin Defendant and its agents and employees from continuing the unlawful actions described herein;

C.    Plaintiff recover treble actual damages;

D.    Plaintiff recover reasonable attorneys' fees and costs as allowed by law;

E.    Plaintiff recover pre-judgment and post-judgment interest at the highest rate allowed by law; and

F.    Plaintiff be granted such other and further relief as the Court deems just and equitable.

## JURY DEMAND

Plaintiff requests a trial by jury in this matter.

Dated:  July 17, 2015

Respectfully submitted,

BY: */s/ Wallace H. Harrell*
**Gilbert, Harrell, Sumerford &
    Martin, P.C.**

Wallace E. Harrell
Ga. Bar No.328800
Mark D. Johnson
Ga. Bar No. 395041
777 Gloucester Street
Brunswick, GA 31521-0190
Telephone: (912) 256-6700
Telecopy: (912) 264-0244
wharrell@gilbertharrelllaw.com
mjohnson@gilbertharrelllaw.com

R. Stephen Berry
D.C. Bar No. 234815
**Berry Law PLLC**
1717 Pennsylvania Avenue, N.W.
Suite 850
Washington, D.C. 20006
Telephone: (202) 296-3020
Facsimile: (202) 296-3038
sberry@berrylawpllc.com
 *(Petition for Admission Pro Hac Vice
Pending)*

**Attorneys for Plaintiff**

31