# In the United States District Court for the Southern District of Georgia Brunswick Division

GLYNN-BRUNSWICK HOSPITAL          *
AUTHORITY and SOUTHEAST           *
GEORGIA HEALTH SYSTEMS, INC.,     *
individually and as members       *
of classes,                       *
                                  *          CV 215-091
                                  *
        Plaintiffs,               *
                                  *
    v.                            *
                                  *
BECTON, DICKINSON AND             *
COMPANY,                          *
                                  *
        Defendant.                *

## ORDER

This matter comes before the Court on a Motion to Dismiss filed by Defendant Becton, Dickinson and Company ("Defendant"), which the parties have briefed extensively. See Dkt. Nos. 9, 28, 31, 34, 38, 43-44. The Court held a hearing on this Motion on December 3, 2015. Dkt. No 42. For the reasons set forth below, Defendant's Motion to Dismiss (dkt. no. 9) is **GRANTED**.[1]

---

[1] Also showing as pending upon the docket of this case is Defendant's Oral Motion for a Hearing on the Motion to Dismiss. Dkt. No. 20. As the Court stated on the record on December 3, 2015, Defendant's Oral Motion for a Hearing (dkt. no . 20) was, necessarily, **GRANTED** by virtue of the motions hearing held that day. Dkt. No. 42, 4:2-4. Accordingly, the Clerk of Court is **DIRECTED** to update this docket entry to reflect the Court's ruling.

**BACKGROUND**

Plaintiffs Glynn-Brunswick Hospital Authority, doing business as Southeast Georgia Health System, and Southeast Georgia Health System, Inc. (collectively, "Plaintiffs") operate two hospitals providing inpatient acute care in Georgia. Dkt. No. 1, ¶ 10. Defendant is a New Jersey corporation, with its principal place of business in New Jersey, that manufactures hypodermic syringes, IV catheters, and other medical supplies. Id. at ¶¶ 11, 68. Plaintiffs purchase Defendant's syringes and IV catheters for use in their healthcare facilities. Id. at ¶ 10.

## I. The Hypodermic-Syringe and IV Catheter Industries

In recent years, the hypodermic-syringe industry has undertaken an initiative to reduce the risks associated with the use of syringes. Id. at ¶ 4. Among these risks is that nurses experience over 600,000 accidental needle sticks each year and, in some instances, contract diseases or other illnesses as a result. Id. at ¶ 3. Additionally, the practice of reusing syringe bodies threatens the transmission of contaminated blood. Id. at ¶¶ 6, 48. Thus, in 2000, Congress passed the federal Needlestick Safety and Prevention Act, which "directed acute care providers among others to use safer practices to reduce injury from 'sharps' such as syringes and IV catheters." Id. at ¶ 50.

For its part, Defendant has created a manual safety syringe by adding a needle shield and a recapping mechanism to a conventional syringe. Id. at ¶ 4. Despite being Defendant's best-selling syringe, the manual safety syringe neither materially lowers the frequency of needle sticks nor prevents the reuse of contaminated syringes. Id. The manual safety syringe has received the rating of "unacceptable" from the acclaimed testing laboratory, Emergency Care Research Institute. Id. at ¶ 5.

Defendant's competitor, Retractable Technologies, Inc. ("Retractable"), on the other hand, has developed a retractable syringe, in which the needle automatically retracts into the barrel after use, nearly eliminating the risk of needle sticks. Id. at ¶ 6. Further, the plunger seals in the retractable syringe dislodge after injection, such that the syringe cannot be reused on other patients. Id. The retractable syringe boasts the highest safety rating from the Emergency Care Research Institute. Id.

In 2001, Retractable filed suit against Defendant in the Eastern District of Texas, alleging unfair competition and antitrust violations, which the parties later settled. Id. at ¶ 60 (citing Retractable Techs., Inc. v. Becton, Dickinson & Co., No. 5:01-cv-036 (E.D. Tex. Jan. 29, 2001)). Defendant later introduced its own line of retractable syringes into the

marketplace, id. at ¶ 90, which resulted in Retractable filing a second lawsuit against Defendant in the Eastern District of Texas in 2007, id. at ¶ 61 (citing Retractable Techs., Inc. v. Becton, Dickinson & Co., No. 2:07-cv-250 (E.D. Tex. June 6, 2007). In the second action, Retractable claimed patent infringement, antitrust violations, false advertising, and unfair competition. Id. at ¶ 61 (citing Retractable Techs., Inc., No. 2:07-cv-250).

A jury determined that Defendant was liable for infringing Retractable's patented technology for the retractable syringe. Id. (citing Retractable Techs., Inc., No. 2:07-cv-250). Additionally, Defendant was found liable for attempting to monopolize the safety-syringe market, as well as false advertising in disparaging Retractable's products while making misleading or unsubstantiated statements about its own. Id. at ¶¶ 62, 94-95, 99 (citing Retractable Techs., Inc. v. Becton, Dickinson & Co., No. 2:08-cv-16 (E.D. Tex. Nov. 10, 2014)).[2]

Notwithstanding these events, Defendant's syringe sales have consistently comprised a dominant share of the syringe market. See id. at ¶¶ 34, 102. After acquiring a significant safety syringe rival, Safety Syringes Inc., in 2012, id. at ¶ 102, Defendant increased its already dominant market presence to

---

[2] While originally filed as a single action, Retractable's claims of patent infringement were severed, and thus tried separately, from the antitrust, false advertising, and unfair competition claims. Dkt. No. 1, ¶ 60.

an impressive 70% share by revenue, id. at ¶ 34. Meanwhile, Defendant's next largest competitor, Covidien, holds approximately a 17% market share. Id. at ¶ 34. Of its competitors having below 1% in market share prior to 2004, none rose anywhere above a 1.5% share from 2004 to 2010. Id. at ¶ 38. Additionally, Defendant has continued to charge higher prices than its competitors, selling its syringes for 22% to 33% more than the price of Covidien's manual safety syringes, and as much as 36% more than that of Retractable's retractable syringes. Id. at ¶ 30.

With regard to IV catheters, Defendant and its competitors manufacture both conventional IV catheters and IV catheters with additional safety features. Id. at ¶ 27. Defendant recently acquired a primary IV catheter rival, CareFusion Corporation, and now holds over a 65% share of the IV catheter market by revenue. Id. at ¶ 43. Notably, small firms in this industry saw only a 0.5% increase in their market shares from 2004 to 2010. Id. at ¶ 47. Although Defendant charges higher prices for its IV catheters than do its competitors—22% to 33% more than its next largest competitor, Covidien, and up to 37% more than Retractable—this practice has jeopardized Defendant's market share only to the extent of a 1% loss over a five-year period. Id. at ¶ 39.

## II. The Contracting and Purchasing Process

Plaintiffs and similar acute care providers obtain Defendant's syringes and IV catheters through a multistep contracting and purchasing process. To begin, a group purchasing organization ("GPO") acts on behalf of its member providers in negotiating the purchase of Defendant's medical supplies. Id. at ¶ 113. The GPO, however, does not actually purchase or sell Defendant's products on behalf of the providers. Id. Rather, the GPO negotiates a "net dealer contract" with Defendant and notifies its members of the terms available to them under this contract, including the negotiated prices, rebates, and other discounts for purchasing Defendant's products. Id. at ¶¶ 113-14.

If an acute care provider would like to buy Defendant's medical products under the terms of the net dealer contract, it must notify Defendant directly. Id. at ¶ 114. The provider then negotiates with a distributor, or dealer, that purchases medical supplies from manufacturers for resale to healthcare providers and other customers. See id. at ¶¶ 115-16. The provider and distributor enter into a "cost-plus" contract, pursuant to which the distributor agrees to buy Defendant's products at the GPO-negotiated rates and sell the products to the provider at a price equal to the cost to procure them plus a fixed percentage markup of that cost. Id. at ¶ 115.

The provider then sends a "letter of commitment" informing Defendant that it has contracted with the distributor. <u>Id.</u> at ¶ 116. The letter of commitment further instructs Defendant that it should sell its products to the distributor at the price, and under the terms, provided in the net dealer contract. <u>Id.</u> Defendant, in turn, enters into a "dealer notification agreement" with the distributor that sets forth the terms of their relationship in accordance with the GPO net dealer contract for sales to the provider. <u>Id.</u> at ¶ 117.

Because some of the contracts linking Defendant, the distributor, and the acute care provider are negotiated between Defendant and the GPO, <u>id.</u> at ¶ 66, these contracts often contain three similar features. First, Defendant's net dealer contract with the GPO, and its dealer notification agreement with the distributor, commonly provide for rebate bundling, which means that Defendant agrees to pay substantial rebates on the bundled products purchased by an acute care provider and its distributor in the given year. See <u>id.</u> at ¶¶ 66, 68-70, 104. However, if a provider or its distributor switches any substantial amount (typically 5% to 15%) of its historic purchases of any product, such as syringes or IV catheters, from Defendant to a competitor, Defendant may refuse to pay rebates on all of the products purchased by the provider or its distributor. <u>Id.</u> at ¶¶ 69-70, 104.

AO 72A
(Rev. 8/82)

Second, the net dealer contract and dealer notification agreement typically require that the acute care provider or its distributor commit to making its historic level of purchases for each product, in order to receive favorable pricing and rebates. Id. at ¶¶ 66, 76-77, 104. That is, the provider or its distributor must agree to buy the same volume of a product, such as syringes or IV catheters, that it purchased in the previous year, or else it receives Defendant's worst pricing—"Tier One" on Defendant's pricing scale. Id. at ¶¶ 76, 104. If the provider or its distributor makes this commitment, it receives pricing at one of the four remaining tiers—Tier Two through Tier Five—with the higher tiers requiring a greater annual volume commitment and offering better pricing. Id. at ¶ 77. Importantly, if a provider or its distributor purchasing at any tier fails to meet its volume commitment, it constitutes a lack of "loyalty" to Defendant and results in penalty Tier One pricing and the forfeiture of year-end rebates. Id. at ¶¶ 75, 77.

Third, and finally, Defendant's contracts with the GPO and distributor often mandate that the distributor handle only Defendant's syringes and IV catheters, or, in some cases, only the syringes and IV catheters of Defendant and another large competitor. Id. at ¶¶ 66, 83, 104. As a variation on this "sole-source" requirement, the contracts sometimes stipulate

that the GPO or distributor must promote Defendant's syringes or IV catheters over those of competitors, which may include the GPO or distributor paying its employees more for selling Defendant's products. Id. at ¶¶ 86, 104. Another provision contributing to the sole-source nature of these contracts states that Defendant will pay the GPO large sums of "administration fees" when the GPO's member providers buy Defendant's products, creating a lucrative incentive for the GPO to endorse these products over others. Id. at ¶ 87.

Following this process, Plaintiffs' GPO, Novation, LLC ("Novation"), negotiated the terms of a Net Dealer Contract with Defendant sometime prior to March 2012, including certain rebates and other discounts available to Plaintiffs and other Novation members. Id. at ¶¶ 113, 118. Upon learning of those terms, Plaintiffs notified Defendant of their interest in purchasing its medical products. Id. at ¶¶ 114, 118. Plaintiffs then entered into a cost-plus distribution agreement ("Distribution Agreement") with medical-supply dealer Owens and Minor on March 1, 2012. Id. at ¶¶ 115, 118.

Under the Distribution Agreement, Plaintiffs have made a "volume commitment" to buy "not less than $7 million a year [in] syringes, IV catheters and other healthcare supplies" from Owens and Minor, for a five-year period ending on March 1, 2017. Id. at ¶ 118. If Plaintiffs fail to meet the volume commitment in

any given year, they must pay a large penalty. Id. The
Distribution Agreement also contemplates pricing on a cost-plus
basis, with "cost" defined, in part, as "the cost or expense
incurred by [Owens and Minor] to procure the product (excluding
. . . any discounts, fees and other incentives paid by
supplier[] [Defendant] to [Owens and Minor] but including any
manufacturer inbound freight and other manufacturer charges)."
Id. at ¶ 119 (quoting Distribution Agreement, ¶ 4.1). In other
words, Plaintiffs pay Owens and Minor the Novation-negotiated
rates as the "base cost," plus a percentage markup of 3.00% or
3.75%, for the supplies purchased. Id.[3]

## III. Plaintiffs' Claims for Relief

On July 17, 2015, Plaintiffs filed this action against
Defendant, purportedly on behalf of a class of acute care
providers having purchased Defendant's hypodermic syringes, as
well as a class having purchased its IV catheters, on or after
July 17, 2011, under cost-plus contracts requiring that the
distributor pass on all of Defendant's pricing to the provider.
Id. at ¶¶ 14, 20. Plaintiffs assert two claims of
monopolization in violation of Section 2 of the Sherman Act, 15
U.S.C. § 2—one relating to Defendant's syringe sales, and the
other its sales of IV catheters. Id. at ¶¶ 123-32. Plaintiffs

---

[3] While Plaintiffs' Complaint discusses the contents of the relevant
contracts, neither Plaintiffs nor Defendant have submitted copies of
these contracts in connection with any filing before the Court.

contend that they have standing to pursue these claims, because they have suffered antitrust price injury in purchasing Defendant's products—not as direct purchasers, but as indirect purchasers under cost-plus distributor contracts predating the purchases and requiring the passing on of all overcharges. Id. at ¶¶ 120-22.

According to Plaintiffs, the relevant syringe market consists of the sales of Defendant's and its competitors' hypodermic syringes—including conventional, manual safety, and retractable syringes—for use by acute care providers nationwide. Id. at ¶ 26. Similarly, Plaintiffs define the relevant IV catheter market as encompassing the nationwide sales of Defendant's and its competitors' IV catheters, both conventional and with added safety features, for use by acute care providers. Id. at ¶ 27.[4] Plaintiffs allege that Defendant has market power in each of these markets, by virtue of "its demonstrated ability to control pricing or exclude competition; its dominant market share, and the high barriers to competitive entry and expansion." Id. at ¶¶ 124, 129.

Plaintiffs further assert that Defendant has employed the following six "exclusionary schemes" as part of an "integrated strategy to maintain market power" in the relevant syringe

---

[4] Plaintiffs specify that "acute care providers" include "hospitals, hospital systems, and related facilities that perform surgery and other care on an in-patient [sic] basis (and possibly out-patient [sic] services as well)." Dkt. No. 1, ¶¶ 26-27.

market: (1) rebate-bundling contracts that penalize severely competitive syringe purchases; (2) penalty contracts that raise the costs of competitive purchases; (3) sole-source contracts that deny competitors critical distribution; (4) theft of Retractable's innovative technology to impede its market entry; (5) deception and false advertising to deny competitors market share; and (6) acquisition of a significant rival to eliminate competition. Id. at ¶ 125; see also id. at ¶¶ 68-102. To maintain its market power in the relevant IV catheter market, Plaintiffs contend that Defendant has relied on four of these same exclusionary schemes, using rebate-bundling, penalty, and sole-source contracts, as well as acquiring a primary rival. Id. at ¶¶ 130, 103-07.

Plaintiffs maintain that Defendant has used its power in the relevant markets to charge the class of acute care providers above-competitive pricing through the pass-on requirements of their cost-plus distribution agreements. Id. at ¶¶ 108, 110, 126, 131. Plaintiffs further claim that Defendant has used its market power to suppress quality competition and, in turn, deny the providers competitive choice and access to innovative technology. Id. To remedy these alleged injuries, Plaintiffs request the following relief: (1) a declaration that Defendant's conduct violates Section 2 of the Sherman Act, 15 U.S.C. § 2; (2) a permanent injunction precluding Defendant from further

engaging in such conduct; (3) treble actual damages; (4) reasonable attorneys' fees and costs; and (5) prejudgment and postjudgment interest. Id. at p. 34.

**LEGAL STANDARDS**

Federal Rule of Civil Procedure 8(a) requires that a plaintiff's complaint contain both "a short and plain statement of the grounds for the court's jurisdiction" and "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(1)-(2). Accordingly, a responding party may move to dismiss the complaint based on a "lack of subject-matter jurisdiction," Fed. R. Civ. P. 12(b)(1) ("Rule 12(b)(1)"), or a "failure to state a claim upon which relief can be granted," Fed. R. Civ. P. 12(b)(6) ("Rule 12(b)(6)").

A Rule 12(b)(6) motion challenges the legal sufficiency of the complaint in setting forth a claim to relief. See Fed. R. Civ. P. 12(b)(6). While a complaint need not contain detailed factual allegations, it "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citing Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)) (interpreting Fed. R. Civ. P. 8(a)(2)). To be plausible on its face, a complaint must set forth enough facts to "allow[] the

court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id.

A plaintiff, therefore, must plead more than mere labels and conclusions, and a formulaic recitation of the elements of a particular cause of action does not suffice. Twombly, 550 U.S. at 555. Rather, at a minimum, a complaint should "contain either direct or inferential allegations respecting all the material elements necessary to sustain a recovery under some viable legal theory." Fin. Sec. Assurance, Inc. v. Stephens, Inc., 500 F.3d 1276, 1282-83 (11th Cir. 2007) (per curiam) (quoting Roe v. Aware Woman Ctr. for Choice, Inc., 253 F.3d 678, 683 (11th Cir. 2001)).

In evaluating a Rule 12(b)(6) motion, a court must "accept as true the facts as set forth in the complaint and draw all reasonable inferences in the plaintiff's favor." Randall v. Scott, 610 F.3d 701, 705 (11th Cir. 2010). Ordinarily, a court's review on a motion to dismiss is limited to the factual allegations on the face of the complaint. See Iqbal, 556 U.S. at 678. If a court is presented with matters outside the pleadings on a motion to dismiss, the motion to dismiss is converted into one for summary judgment. Fed. R. Civ. P. 12(d). However, there are certain instances in which a court may consider matters outside the pleadings without transforming a motion to dismiss into a summary judgment motion, see Davis v.

Self, 547 F. App'x 927, 929 (11th Cir. 2013)—for example, where those outside matters are facts subject to judicial notice, see Fed. R. Evid. 201(a)-(d); Tellabs, Inc., 551 U.S. at 322; see also Fed. R. Evid. 201(b)(2) ("The court may judicially notice a fact that is not subject to reasonable dispute because it . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned.").

## DISCUSSION

Defendant now moves to dismiss Plaintiffs' Complaint for failure to state a claim under Rule 12(b)(6). Dkt. No. 9. Defendant contends that Plaintiffs and the other members of the proposed class, by Plaintiffs' own concession, are not direct purchasers of its medical products, and thus lack standing to bring damages claims against Defendant on the basis of the alleged antitrust violations. Id. at pp. 9-15. Additionally, Defendant argues that Plaintiffs fail to adequately plead the elements of their monopolization claims. Id. at pp. 15-22.

Plaintiffs urge the Court to deny Defendant's Motion to Dismiss and allow them to proceed with their claims. Dkt. No. 28. Plaintiffs maintain that they sufficiently allege standing to pursue these claims, pursuant to a "cost-plus exception" or a "conspiracy exception" to the direct purchaser rule cited by Defendant. Id. at pp. 18-26. Additionally, Plaintiffs assert that they plead facts plausibly demonstrating each of the

elements of their claims of monopoly maintenance against

Defendant. Id. at pp. 6-18.

Applying the above-described standards, the Court addresses

the parties' arguments regarding standing, and the sufficiency

of the monopolization allegations, in turn.[5]

## I. Defendant's Motion to Dismiss Plaintiffs' Damages Claims for Lack of Standing

Section 4 of the Clayton Act provides that "any person who

shall be injured in his business or property by reason of

anything forbidden in the antitrust laws may sue

therefor . . . and shall recover threefold the damages by him

---

[5] Notable here is that a motion to dismiss for lack of standing would typically invoke Rule 12(b)(1), not Rule 12(b)(6). See DiMaio v. Democratic Nat'l Comm., 520 F.3d 1299, 1301 (11th Cir. 2008) ("[S]tanding is a threshold jurisdictional question which must be addressed prior to and independent of the merits of a party's claims." (quoting Bochese v. Town of Ponce Inlet, 405 F.3d 964, 974 (11th Cir. 2005))). Nevertheless, Defendant's Motion does not dispute this Court's authority to decide the particular claims asserted by Plaintiffs, but rather challenges the sufficiency of Plaintiffs' Complaint in setting forth a claim that would entitle them to relief. See Dkt. No. 9. Because it appears that Defendant has appropriately styled its Motion as one filed pursuant to Rule 12(b)(6), and Plaintiffs do not argue otherwise, the Court reviews this Motion under the standard applicable to that rule. See Warren Gen. Hosp. v. Amgen Inc., 643 F.3d 77, 83 (3d Cir. 2011) (affirming the district court's dismissal under Rule 12(b)(6) for lack of standing, and noting that "[a] dismissal for lack of statutory standing is effectively the same as a dismissal for failure to state a claim" (alteration in original) (quoting Baldwin v. Univ. of Pittsburgh Med. Ctr., 636 F.3d 69, 73 (3d Cir. 2011))). In the end, however, this distinction is of no consequence, as a review of this Motion under Rule 12(b)(1) would involve the same legal standards and thus lead to the same result obtained here. See Carmichael v. Kellogg, Brown & Root Servs., Inc., 572 F.3d 1271, 1279 (11th Cir. 2009) (stating that the same standards of review apply in evaluating dismissal based on a lack of subject-matter jurisdiction and a failure to state a claim).

AO 72A
(Rev. 8/82)

16

sustained, and the cost of suit, including a reasonable attorney's fee." 15 U.S.C. § 15(a). The United States Supreme Court has narrowly interpreted the scope of Section 4, so as to constrain the class of persons having statutory standing to bring an antitrust action for damages. See Kansas v. UtiliCorp United, Inc., 497 U.S. 199, 208-12 (1990) (holding that only a customer who purchases goods directly from an alleged antitrust violator has standing to bring claims under Section 4, even if the direct purchaser passes on the entirety of the unlawful overcharges to its downstream customers); Illinois Brick Co. v. Illinois, 431 U.S. 720, 729-36 (1977) (holding that an indirect purchaser of a product cannot sue a distant manufacturer for alleged antitrust violations under a "pass-on" theory—meaning a theory that the intermediary passed on the unlawful overcharges through the distribution channel to them); see also Hanover Shoe, Inc. v. United Shoe Mach. Corp., 392 U.S. 481, 488-94 (1968) (prohibiting a manufacturer from asserting a pass-on defense against the direct purchaser of its product).

Hanover Shoe and its progeny thus "enunciat[e] a bright-line rule that only the purchaser immediately downstream from the alleged monopolist may bring an antitrust action." McCarthy v. Recordex Serv., Inc., 80 F.3d 842, 848 (3d Cir. 1996) (citing Illinois Brick, 431 U.S. at 744). The rationale for this so-called "direct purchaser rule" is twofold: First, in bringing

AO 72A
(Rev. 8/82)

the prohibition on the offensive use of pass on in line with its defensive use, the rule eliminates the risk of multiple liability for defendants. Lowell v. Am. Cyanamid Co., 177 F.3d 1228, 1229 (11th Cir. 1999) (quoting Illinois Brick, 431 U.S. at 730). That is, the rule avoids a situation where the indirect purchaser, relying on a pass-on theory, recovers for all or part of an overcharge passed on to it, yet the alleged monopolist is unable to assert pass on in defending against a subsequent suit by the direct purchaser for the full amount of the overcharge. Id. (quoting Illinois Brick, 431 U.S. at 730).

Second, the rule ensures that courts will not have to undertake the uncertain and difficult task of tracing the chain of distribution and analyzing pricing and output decisions, under the laws of supply and demand, to determine what fraction of an overcharge was absorbed, and what fraction was passed on, at each level. See id. at 1229-31 (quoting Illinois Brick, 431 U.S. at 731-32, 742). Such an exercise, according to the Supreme Court, would not only impose undue costs on the judicial system but also undermine the efficient enforcement of federal antitrust laws. Id. at 1229-30 (quoting Illinois Brick, 431 U.S. at 731-32).

The Supreme Court, however, has recognized that the rationales underlying the direct purchaser rule "will not apply with equal force in all cases." UtiliCorp, 497 U.S. at 216.

AO 72A
(Rev. 8/82)

Accordingly, the Supreme Court has enumerated two exceptions to the rule, which provide for indirect purchaser standing "where there is a preexisting cost-plus contract or where the direct purchaser is owned or controlled by its customer." Lowell, 177 F.3d at 1229 n.2 (citing Illinois Brick, 431 U.S. at 735-36 & n.16). The Court has declined to "carve out exceptions to the direct purchaser rule for particular types of markets," stating that any such exception would undermine the rule and lead to the counterproductive exercise of litigating a series of exceptions. UtiliCorp, 497 U.S. at 216-17 (alterations omitted) (quoting Illinois Brick, 431 U.S. at 744). Nevertheless, the Eleventh Circuit Court of Appeals has determined that the direct purchaser standing rule simply does not apply in the case of a vertical conspiracy, with no allegations of pass on, "where the plaintiff has purchased directly from a conspiring party in the chain of distribution." Lowell, 177 F.3d at 1230, 1232.

In the case at bar, the parties agree that Plaintiffs and other members of the proposed class are not Defendant's direct purchasers. See Dkt. No. 1, ¶ 122; Dkt. No. 9, pp. 9-11; Dkt. No. 28, p. 18. Plaintiffs' factual allegations support this conclusion: the acute care providers purchase Defendant's products from distributors, not from the manufacturer Defendant; the providers pay the distributors for the products; the price that the providers pay for the products is determined by their

cost-plus contracts with the distributors; and the providers receive the products from the distributors. See Dkt. No. 1, ¶¶ 112-20. Thus, remaining at issue is whether Plaintiffs and the other class members, as indirect purchasers, have standing to pursue their damages claims based on one of the recognized exceptions to the direct purchaser rule, or the inapplicability of that rule to this case.

### A. Cost-Plus Exception

To come within the Supreme Court's cost-plus exception to the direct purchaser rule, the indirect purchaser must be operating under a cost-plus distribution agreement that meets certain requirements. See Illinois Brick, 431 U.S. at 735-36. Specifically, the cost-plus agreement must (1) predate the alleged overcharge and (2) obligate the indirect purchaser to buy a "fixed quantity regardless of price." Id. In these circumstances, the justifications for the direct purchaser rule are not present, because the indirect purchaser's commitment to buy a fixed quantity of products from the direct purchaser (i.e., the distributor), regardless of their price, insulates the direct purchaser from any decrease in sales as a result of passing on the overcharge. Id. at 736.

Because the direct purchaser need not absorb any of the overcharge to compete for the indirect purchaser's business, the direct purchaser simply passes on the overcharge in full. See

AO 72A
(Rev. 8/82)

id. As a result, "[t]he effect of the overcharge is essentially determined in advance, without reference to the interaction of supply and demand that complicates the determination in the general case." Id.

Here, the parties dispute whether the Supreme Court's decision not to apply the cost-plus exception to the facts in UtiliCorp, 497 U.S. at 217-18, served to repeal this exception. See, e.g., Dkt. No. 9, pp. 2, 12-13; Dkt. No. 28, p. 19 n.15. The Court need not resolve this issue here, because even assuming that the exception remains viable after UtiliCorp, Plaintiffs fail to meet its requirements for standing in this case.

As to the first requirement, Plaintiffs fail to allege that the cost-plus agreements, such as the Distribution Agreement with Owens and Minor, preexisted the alleged overcharge. See Illinois Brick, 431 U.S. at 735-36 (cost-plus contract must predate the alleged overcharge). Plaintiffs' account of the contracting and purchasing process indicates that the alleged overcharge first appeared in the net dealer contracts between Defendant and the GPOs, such as Novation, which set forth the pricing and discounts available for the sale of Defendant's products to GPO members. See Dkt. No. 1, ¶¶ 113-14. Consequently, Plaintiffs and other GPO members were aware of Defendant's pricing terms at all relevant times: in deciding to

AO 72A
(Rev. 8/82)

notify Defendant of their intent to purchase its products, in entering into a distribution agreement with a distributor under these terms, and in instructing Defendant to charge the distributor the negotiated rates. See id. at ¶¶ 114-16.

The resulting contracts—in Plaintiffs' case, their cost-plus Distribution Agreement with Owens and Minor, as well as the Dealer Notification Agreement between Owens and Minor and Defendant—are based on and incorporate the pricing terms established in the initial net dealer contract between Defendant and the GPO. Id. at ¶¶ 115, 117-19. It thus appears that any potential action by Defendant to overcharge for its products occurred when it contractually set the sales price with the GPO, such that Plaintiffs' and the other proposed class members' subsequent cost-plus contracts with distributors cannot be said to preexist the alleged overcharges.

Plaintiffs miss the mark in arguing that these cost-plus distribution agreements meet this requirement because the class members "allege that overcharge remedy is sought only after their . . . distributor contracts are in force." See Dkt. No. 34, p. 8 (emphasis omitted). Plaintiffs' interpretation renders this requirement superfluous, because in the type of distribution chain to which the direct purchaser rule and this exception apply, an indirect purchaser does not buy products from a manufacturer prior to entering into an agreement with a

distributor (i.e., the direct purchaser). As such, the indirect purchaser does not suffer any price injury that could give rise to antitrust claims against the manufacturer before contracting with the distributor. Rather, the indirect purchaser's agreement with the distributor necessarily precedes its purchase of the manufacturer's products, resulting price injury, and decision to file suit against the manufacturer. Thus, under Plaintiffs' construction, all indirect-purchaser plaintiffs would meet this requirement, because their distribution agreements would be in place at the time that they filed suit seeking a remedy for alleged overcharges.[6]

Nor do Plaintiffs' allegations satisfy the second requirement of the cost-plus exception, mandating that a distribution agreement contemplate the sale of a fixed quantity of goods. See Illinois Brick, 431 U.S. at 735-36 (cost-plus contract must obligate the indirect purchaser to purchase a

_____

[6] The Court can imagine a situation in which an indirect purchaser, dissatisfied with the price that a manufacturer has insisted upon in a net dealer agreement with a GPO, files suit against the manufacturer before ever contracting with a distributor. However, in such circumstances, it would be immediately apparent that the indirect purchaser would lack standing to pursue an action under Section 4, because it would not have suffered any injury "in [its] business or property" that would allow for the recovery of "threefold the damages by [it] sustained." 15 U.S.C. § 15(a). Because a court would not even need to reach the direct purchaser rule, and the cost-plus exception thereto, to conclude that the indirect purchaser lacked standing, the Court cannot find that such a situation is the type that this exception is intended to prevent. As such, this scenario would not trigger the issue of a preexisting a cost-plus contract in any event, and, accordingly, it has no impact on the Court's finding that Plaintiffs construe this requirement such that it would be met in every case to which the cost-plus exception applies.

"fixed quantity regardless of price"). Plaintiffs do not specify the terms of any distribution agreement entered into by a member of the proposed class, other than their own Distribution Agreement with Owens and Minor. See Dkt. No. 1, ¶¶ 115, 118-19. The Distribution Agreement, Plaintiffs allege, includes a "volume commitment" according to which Plaintiffs must buy "not less than $7 million a year [in] syringes, IV catheters and other healthcare supplies" from Owens and Minor for a period of five years. Id. at ¶ 118. In other words, Plaintiffs have agreed to purchase a minimum dollar amount of assorted healthcare supplies from Owens and Minor—not a fixed quantity or dollar amount of supplies, not just hypodermic syringes and IV catheters, and not just supplies manufactured by Defendant. As such, Plaintiffs' factual allegations do not suggest that they have given Owens and Minor any guarantee that they will purchase any of Defendant's hypodermic syringes and IV catheters at all, much less a fixed quantity thereof.

Plaintiffs' argument that Defendant's contracts with Novation and Owens and Minor "effectively fix" the amount of Plaintiffs' purchases does not persuade the Court otherwise. See Dkt. No. 28, pp. 21-22. According to the allegations in the Complaint, the overall effect of the rebate-bundling and penalty contracts is to penalize Plaintiffs and Owens and Minor by denying rebates—and, in some cases, reverting to Tier One

pricing—if either switches a substantial amount of its purchases of any product to a competitor, or if Owens and Minor purchases less than the historical amount of any product for Plaintiffs. See Dkt. No. 1, ¶¶ 66, 68-70, 76-77, 104. By Plaintiffs' own account, then, these contracts do not expressly preclude Plaintiffs or Owens and Minor from switching to a competitor for hypodermic syringes and IV catheters, or purchasing alternative supplies from Defendant to use in place of these products. Even if the contracts contemplate monetary penalties in the year that Plaintiffs begin buying less of these products from Defendant, these costs merely deter, but do not prohibit, Plaintiffs from doing so.[7]

Equally unavailing is Plaintiffs' alternative argument that even if they are not effectively locked in to a certain number of purchases under the Distribution Agreement, the agreement

---

[7] Plaintiffs contend that Defendant's sole-source contracts with GPOs and distributors likewise contribute to effectively fixing the quantity of syringes and IV catheters that Plaintiffs are obligated to purchase. Dkt. No. 28, pp. 21-22. Unlike their pleadings with regard to rebate bundling and penalties, however, Plaintiffs' factual allegations do not suggest that Defendant's contracts with Novation and Owens and Minor—or any other specific contracts with GPOs and distributors—contain sole-source requirements. To the contrary, Plaintiffs represent that the Distribution Agreement with Owens and Minor provides for their purchase of "syringes, IV catheters, and other healthcare supplies," dkt. no. 1, ¶ 118, suggesting that Owens and Minor's inventory is not limited to supplies of Defendant in particular. In any event, Plaintiffs' pleadings render it possible, but not plausible, that Defendant's contracts with Novation and Owens and Minor contain sole-source provisions. As a result, the Court declines to consider whether a sole-source requirement in those contracts would have the effect of fixing the amount of Plaintiffs' purchases.

AO 72A
(Rev. 8/82)

nevertheless serves as the "functional equivalent" of a fixed-quantity contract within the cost-plus exception. See Dkt. No. 28, pp. 22-23 (citing In re Beef Antitrust Indus. Antitrust Litig., 600 F.2d 1148, 1164-66 (5th Cir. 1979)). In In re Beef, the Fifth Circuit Court of Appeals found that the cost-plus exception, though narrow, encompasses a pass-on situation that is the functional equivalent of a cost-plus contract case, in that the impact of an overcharge on an intermediary's pricing decisions is determined in advance, without regard to the interactions of supply and demand. In re Beef Antitrust Indus. Litig., 600 F.2d at 1163-66. The Fifth Circuit observed that "[f]unctional equivalence is not lost simply because the proponent of passing-on theory cannot demonstrate that the middleman suffered no loss in volume as the result of raising the price to his customers." Id. at 1164.

While the parties fervently dispute the continued viability of the reasoning in In re Beef, see, e.g., dkt. no. 31, pp. 7-8; dkt. no. 34, pp. 5-8, this issue is inconsequential, because it appears that Plaintiffs ultimately fail to allege functional equivalence so as to come within the rule of that case. As discussed supra, Plaintiffs are able to decrease their demand for Defendant's syringes and IV catheters, and, as a result, the impact of any monopoly pricing by Defendant is neither contractually predefined nor free from the influence supply and

demand.  Although Plaintiffs' decreased demand would, indeed, result in both Plaintiffs and Owens and Minor forfeiting year-end rebates and receiving penalty pricing on any subsequent purchases, Plaintiffs allege only that Owens and Minor would contractually pass on the penalty pricing.  See Dkt. No. 1, ¶ 119 (defining the "cost" to be charged to Plaintiffs in the cost-plus pricing arrangement as the cost for Owens and Minor to obtain the product, excluding "any discounts, fees and other incentives paid by supplier[] [Defendant] to [Owens and Minor]").

Significantly, Plaintiffs' allegations do not suggest that Owens and Minor could pass on—or have any other recourse to mitigate—its losses owing to Defendant's withholding of year-end rebates that it had expected to receive.  It is Plaintiffs' inability to show that Owens and Minor is insulated from this loss, not the loss of sales and related profits, that allows this Court to conclude that the functional equivalence theory from In re Beef, regardless of its continued validity, is inapplicable here.

Thus, under the facts as alleged by Plaintiffs, the Distribution Agreement with Owens and Minor does not fix the quantity of Defendant's hypodermic syringes and IV catheters subject to sale—or otherwise dictate the impact of an overcharge for these products—and, therefore, does not satisfy the second

AO 72A
(Rev. 8/82)

requirement to bring this case within the cost-plus exception to the direct purchaser rule.

### B. Vertical Conspiracy

The Eleventh Circuit has joined a number of other circuit courts in finding that the direct purchaser rule does not apply in the case of a vertical conspiracy. Lowell, 177 F.3d at 1231-32 (citing Arizona v. Shamrock Foods Co., 729 F.2d 1208, 1211-13 (9th Cir. 1984), and Fontana Aviation, Inc. v. Cessna Aircraft Co., 617 F.2d 478, 480-82 (7th Cir. 1980)). In Lowell, the plaintiffs sued an upstream supplier for conspiring with middlemen distributors to set a "minimum resale price"—the price at which the distributors would sell the supplier's products to the plaintiffs and other customers—in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1. Id. at 1228-29. The Eleventh Circuit held that the plaintiffs had standing to sue the supplier, because the direct purchaser rule is inapplicable "where the plaintiff has purchased directly from a conspiring party in the chain of distribution." Id. at 1232. The Court reasoned that the rationales for the direct purchaser rule do not apply "to the very different case of vertical conspiracy with no allegations of passing on." Id. at 1230. That is, because a vertical conspiracy case involves "only one illegal act"—the conspiracy itself—there is no threat of double recovery

against the supplier, or of complex allocation issues for the court. Id.

The parties here disagree as to whether the Lowell decision is limited to vertical price-fixing conspiracies, or whether it extends to vertical conspiracies involving other antitrust violations. See Dkt. No. 31, pp. 11-12; Dkt. No. 34, p. 3. Even assuming, without deciding, that Lowell encompasses conspiracies to commit the type of antitrust violation alleged here—namely, monopoly maintenance—Plaintiffs' argument regarding an alleged vertical conspiracy fails.[8] That is, while Plaintiffs now contend that the dealer notification agreements between Defendant and the distributors bring this matter within the

---

[8] It appears that two other circuits have expressly limited the conspiracy exclusion to vertical conspiracies to fix prices. Del. Valley Surgical Supply Inc. v. Johnson & Johnson, 523 F.3d 1116, 1123 n.1 (9th Cir. 2008) ("[T]his court has held that an indirect purchaser may bring suit where he establishes a price-fixing conspiracy between the manufacturer and the middleman." (citing Shamrock Foods Co., 729 F.2d at 1211)); Dickson v. Microsoft Corp., 309 F.3d 193, 215 (4th Cir. 2002) ("[W]e interpret the[] [conspiracy] cases as standing for the more narrow proposition that Illinois Brick is inapplicable to a particular kind of conspiracy—price-fixing conspiracies."). However, as Plaintiffs persuasively point out, "[w]hen Lowell relied upon the [conspiracy] exception, . . . it did not limit its application to any particular antitrust vertical conspiracy and certainly did not rule out application of the exception to a vertical conspiracy leading to monopoly, as opposed to price-fixing, overcharges levied on the hospitals." Dkt. No. 34, p. 2. Indeed, while the facts in Lowell involved a price-fixing conspiracy, the Eleventh Circuit Court spoke in general terms in concluding that vertical conspiracies lie outside the bounds of the direct purchaser rule. See, e.g., Lowell, 177 F.3d at 1232 ("Illinois Brick does not apply to a single vertical conspiracy where the plaintiff has purchased directly from a conspiring party in the chain of distribution."). The Court thus finds adequate reason to further explore the sufficiency of Plaintiffs' allegations of a monopolization conspiracy for the purpose of standing.

vertical-conspiracy doctrine, dkt. no. 28, p. 24, their
Complaint fails to provide any plausible support for this
argument, for several reasons.

At the outset, Plaintiffs' conspiracy argument meets
resistance in the "pass-on" allegations in the Complaint. While
Plaintiffs' counsel correctly noted at the December 3, 2015,
hearing that Plaintiffs may plead a cost-plus exception and
vertical conspiracy in the alternative, dkt. no. 42, 23:21-24:7,
the pass-on allegations in the Complaint—of which there are
many—cannot be parsed from the allegations that Plaintiffs cite
in support of their conspiracy argument. The Complaint defines
the proposed class members as acute care providers having
purchased Defendant's hypodermic syringes or IV catheters under
cost-plus contracts requiring that the distributor pass on
Defendant's pricing to the provider. Dkt. No. 1, ¶¶ 14, 20.
Additionally, the Complaint states that Plaintiffs and the
proposed class members have standing based on the antitrust
price injury that they have sustained as indirect purchasers of
Defendant's products under cost-plus distributor contracts
requiring the passing on of all overcharges. Id. at ¶¶ 120-22.
These allegations of pass on run contrary to the vertical-
conspiracy allegations envisioned by the Court in Lowell. 177
F.3d at 1230 (referring to a "vertical conspiracy with no
allegations of passing on").

AO 72A
(Rev. 8/82)

Additionally, the Complaint lacks any suggestion that the distributors unlawfully combined with Defendant, at any time, to fix the resale price charged to the providers, or to otherwise construct the allegedly exclusionary schemes. Cf. id. at 1228–29. Plaintiffs allege that Defendant negotiates and executes net dealer contracts with GPOs that set forth the terms available to GPO members purchasing Defendant's products— including pricing, rebate-bundling, penalty, and sole-source provisions. Dkt. No. 1, ¶¶ 66–89, 104, 113–14. Only after a provider notifies Defendant of its interest and contracts with a middleman distributor, do Defendant and the distributor enter into a dealer notification agreement. See id. at ¶¶ 114–17.

Crucially, Plaintiffs do not allege that Defendant and the distributor negotiate at any time; rather, they assert that the two enter into a dealer notification agreement defining their relationship pursuant to the terms of the net dealer contract— incorporating the pricing, rebate-bundling, penalty, and sole-source provisions therein. See id. at ¶¶ 66–89, 104, 114–17. Thus, Plaintiffs' Complaint demonstrates, and expressly acknowledges, that the contracts linking Defendant, the distributor, and the provider are essentially negotiated between Defendant and the GPO, not the distributor. Id. at ¶ 66.

The Complaint also suggests that it is Defendant—not the distributor or even the GPO—that insists upon and enforces the

AO 72A
(Rev. 8/82)

rebate-bundling, penalty, and sole-source provisions in these contracts. See, e.g., id. at ¶ 68 ("Becton . . . . exploits [its] diversity [of products] to implement a rebate bundling scheme making it very costly for acute care providers or their distributors to switch to competitive products." (emphasis added)); id. at ¶¶ 75, 77 ("Becton employs contracts to penalize an acute care provider if it displays a lack of 'loyalty' . . . [and] require the acute care provider or its distributor to purchase 80% to 95% of the prior year's syringe volume." (emphasis added)); id. at ¶ 86 ("Becton requires some distributors and GPOs to promote Becton syringes over competitive products." (emphasis added)).

Moreover, the Complaint does not suggest that the distributors agreed to these provisions, or generally entered into the dealer notification agreements, with the specific intent of maintaining Defendant's alleged monopolies. See Dickson, 309 F.3d at 204 n.14 (stating that Section 2 of the Sherman Act, 15 U.S.C. § 2, requires that the alleged coconspirators have a "specific intent to conspire to achieve the stated goal of the conspiracy" (quoting TV Commc'ns Network, Inc. v. Turner Network Tele., Inc., 964 F.2d 1022, 1026-27 (10th Cir. 1992))). Rather, Plaintiffs repeatedly claim that Defendant—and Defendant alone—implements these exclusionary schemes and contracts as part of its own strategy to maintain

AO 72A
(Rev. 8/82)

and abuse its market power.  See, e.g., Dkt. No. 1, ¶ 108 ("By employing [these schemes] . . . , Becton has maintained it[s] market power . . . . [and] has used its market power to charge members of the [proposed class] above-competitive pricing . . . and to deny free, competitive access to innovative [competitive] technology." (emphasis added)); id. at ¶ 120 ("[Members of the proposed class] have suffered antitrust price injury by paying above-competitive pricing as a result of Becton's monopolization of the syringe and IV catheter relevant markets." (emphasis added)); id. at ¶ 125 ("As part of its integrated strategy to maintain market power in this relevant market, Becton has willfully engaged in at least six exclusionary schemes." (emphasis added)).

Plaintiffs' characterization of the agreement as a "mutually beneficial collusion," dkt. no. 34, p. 4, does not change this result.  Plaintiffs emphasize that the distributors stand to benefit from the inflated pricing of Defendant's products, in part because the distributors, on resale, tack on a percentage markup of the cost to obtain the product—a markup that translates to a higher dollar amount with each increase in the product's base cost.  See Dkt. No. 28, pp. 24-25.  However, any intermediary in a chain of distribution whose resale price is calculated on a cost-plus basis is in a position to profit from an increase in the cost of the good.  That an intermediary,

such as the distributors here, stands in this position when the cost of the good is artificially inflated does not, by itself, suggest that the intermediary engaged in anticompetitive behavior to influence such cost in its favor.[9]

Moreover, Plaintiffs' factual allegations suggest that the distributors stood not only to benefit—but also to suffer harm—as a result of the high prices of Defendant's products. Indeed, if the prices of Defendant's products were to cause acute care providers to purchase these products from other manufacturers, the distributors would suffer a loss of sales. If the distributors themselves were to find the products to be cost prohibitive and turn to competing suppliers, the rebate contracts between Defendant and the distributors are such that the distributors would face substantial penalties. As such, the Court cannot find that the potentially beneficial prospects of the distribution agreements alone support an inference that the distributors were motivated to maintain Defendant's monopoly power. Cf. Dickson, 309 F.3d at 204 n.14 (suggesting that a "rational motive to create a monopolistic environment" may provide "an inference of specific intent to conspire to achieve the stated goal of the conspiracy" under Section 2 of the

---

[9] The same can be said of the other purported benefits cited by Plaintiffs: financial incentives paid to the distributor; markups on products other than syringes and IV catheters sold to the providers; protection from competition; and compensation for promoting Defendant's products over others. Dkt. No. 28, p. 25.

Sherman Act (alterations omitted) (quoting TV Commc'ns Network, Inc., 964 F.2d at 1026-27)).

Also unhelpful to Plaintiffs' argument is that their Complaint cites Section 2, rather than Section 1, of the Sherman Act as the basis for their monopolization claims. Id. at ¶¶ 127, 132; cf. Lowell, 177 F.3d at 1229 (involving claims of a vertical price-fixing conspiracy under Section 1 of the Sherman Act, 15 U.S.C. § 1). Unlike Section 1 of the Sherman Act, which makes unlawful "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce," 15 U.S.C. § 1, Section 2 of the Sherman Act more broadly proscribes acts to "monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce," 15 U.S.C. § 2. Although Section 2's prohibition on combinations and conspiracies encompasses some of the same conduct covered under Section 1, see Dickson v. Microsoft Corp., 309 F.3d 193, 202 (4th Cir. 2002), Plaintiffs' reliance on only Section 2, without any mention of a combination, conspiracy, or otherwise unlawful agreement, fails to plausibly indicate that their claims are based on a theory of conspiracy to monopolize, rather than monopolization alone.

Thus, the Complaint alleges, at most, that the contractual arrangement between Defendant and the distributors is such that

AO 72A
(Rev. 8/82)

vertical conspiracies are possible. However, the Complaint

stops there. Without any facts plausibly suggesting that

Defendant and the distributors actually conspired in entering

into these agreements, the Court cannot conclude that Plaintiffs

sufficiently allege vertical conspiracies under Lowell.

### C. Conclusion

Plaintiffs thus are not direct purchasers of Defendant's

products, and fail to plausibly show that any exception to the

direct purchaser rule applies. As such, this case falls

squarely within the ambit of that rule, such that Plaintiffs are

barred from pursuing their damages claims against Defendants.

This portion of Defendant's Motion is, therefore, **GRANTED**.

## II. Defendant's Motion to Dismiss Based on a Failure to Allege Monopoly Maintenance[10]

Section 2 of the Sherman Act provides, in pertinent part,

that "[e]very person who shall monopolize, or attempt to

monopolize, or combine or conspire with any other person or

persons, to monopolize any part of trade or commerce among the

several [s]tates, or with foreign nations, shall be deemed

---

[10] The direct purchaser rule serves only as a limitation on standing to pursue damages claims under Section 4 of the Clayton Act, 15 U.S.C. § 15(a), and does not apply to claims for injunctive relief under Section 16 of the Clayton Act, 15 U.S.C. § 26. Collins v. Int'l Dairy Queen, 59 F. Supp. 2d 1305, 1311 (M.D. Ga. 1999) (quoting Campos v. Ticketmaster Corp., 140 F.3d 1166, 1172 (8th Cir. 1998)). Thus, Plaintiffs' claims for injunctive relief do not present the standing issues discussed in Part I, and, instead, the Court addresses here Defendant's arguments regarding the sufficiency of Plaintiffs' monopolization allegations, as they relate to the remaining claims for injunctive relief.

AO 72A
(Rev. 8/82)

guilty of a felony." 15 U.S.C. § 2. To establish a violation of Section 2, plaintiffs must show: "(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." United States v. Grinnell Corp., 384 U.S. 563, 570-71 (1966).

The first element—monopoly power in a relevant market—requires that plaintiffs demonstrate harm to competition within a distinct market having both product and geographic limitations. Spanish Broad. Sys. of Fla., Inc. v. Clear Channel Commc'ns, Inc., 376 F.3d 1065, 1074 (11th Cir. 2004) (citing U.S. Anchor Mfg. v. Rule Indus., 7 F.3d 986, 995 (11th Cir. 1993)). A failure to delineate either the product or geographic dimension of the relevant market is fatal to an antitrust claim. See id. Additionally, the harm caused by an alleged monopolist must be directed toward competition, rather than a particular competitor, in the relevant market. Id. at 1075-76. Harm to competition occurs where a defendant has substantial market power, such that it is able to control prices or exclude competitors in the relevant market. Aspen Skiing Co. v. Aspen Highlands Skiing Corp., 472 U.S. 585, 595-97, 596 n.20 (1985). Here, Defendant does not challenge Plaintiffs' monopolization claims to the extent that they define the relevant geographic

AO 72A
(Rev. 8/82)

markets for the sales of hypodermic syringes and IV catheters as the United States, see generally dkt. no. 9; instead, the parties' dispute under the first element concerns the relevant product markets and Defendant's alleged monopoly power therein, see id. at pp. 15-17; dkt. no. 28, pp. 6-10.

The relevant product market must include "those products or services that are either (1) identical to or (2) available substitutes for the defendant['s] product or service." Aquatherm Indus., Inc. v. Fla. Power & Light Co., 971 F. Supp. 1419, 1426 (M.D. Fla. 1997) aff'd, 145 F.3d 1258 (11th Cir. 1998). As such, the outer boundaries of the product market are determined by the "reasonable interchangeability" of a product and its substitutes, as well as the "cross-elasticity of demand" for the products. U.S. Anchor Mfg., Inc., 7 F.3d at 995 (citing Brown Shoe Co. v. United States, 370 U.S. 294, 325 (1962)); see also Jacobs v. Tempur-Pedic Int'l, Inc., 626 F.3d 1327, 1337-38 (11th Cir. 2010) (referring to reasonable interchangeability as "reasonable substitutability").[11] As a general matter, all of the purchasers and suppliers within those boundaries comprise the market for the product. See U.S. Anchor Mfg., Inc., 7 F.3d at 995.

---

[11] The cross-elasticity of demand is "the change in the quantity demanded by consumers of one product relative to the change in price of another." Jacobs, 626 F.3d at 1337 n.13. A positive correlation in the cross-elasticity of demand indicates that two products are close substitutes and hence part of the same market. See id.

AO 72A
(Rev. 8/82)

In some cases, the relevant product market may exist as a distinct subset, or "submarket," of a larger product market. Jacobs, 626 F.3d at 1337 (citing U.S. Anchor Mfg., Inc., 7 F.3d at 995). The process for identifying the contours of a product submarket is the same as that for the larger market. U.S. Anchor Mfg., Inc., 7 F.3d at 995. However, some additional "practical indicia" may be helpful to this end, such as "industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors." Jacobs, 626 F.3d at 1337.

Plaintiffs in this case err in narrowly defining the relevant product markets for the sales of hypodermic syringes and IV catheters to include only a subset of purchasers. Plaintiffs' Complaint states that the relevant product markets for syringes and IV catheters consist of the products sold by Defendant and its competitors for use by acute care providers. Dkt. No. 1, ¶¶ 26-27. Acute care providers, Plaintiffs allege, include hospital systems and related facilities that perform surgeries and provide care on an inpatient basis. Id. However, Plaintiffs also recognize that healthcare providers other than acute care providers use syringes and IV catheters in administering patient care, albeit on an outpatient basis. See

id. at ¶ 50 (Needlestick Safety and Prevention Act applies to "acute care providers among others"). As such, Plaintiffs' proposed product markets include only syringes and IV catheters sold to hospital systems and related facilities providing inpatient treatment, while excluding the syringes and IV catheters sold to other healthcare providers, such as nursing homes, physicians' offices, and diabetes centers.

Importantly, Plaintiffs do not allege that there is any difference between a hypodermic syringe or IV catheter that Defendant or its competitor sells to an acute care provider, and one that it sells to another healthcare provider. See Aquatherm Indus., Inc., 971 F. Supp. at 1426 (relevant product market must include all products that are identical); see also Lockheed Martin Corp. v. Boeing Co., 314 F. Supp. 2d 1198, 1224-29 (M.D. Fla. 2004) (pleading of the relevant product market was insufficient where it failed to distinguish between products sold within and outside of the proposed market); cf. Pepsico, Inc. v. Coca-Cola Co., No. 98 CIV. 3282 (LAP), 1998 WL 547088, at *12 (S.D.N.Y. Aug. 27, 1998) (plaintiff adequately plead the relevant product market by showing that a seemingly identical product sold outside of the proposed market differed due to dissimilar delivery methods). Nor do Plaintiffs allege any facts suggesting that a syringe or IV catheter sold to another healthcare provider, such as a physicians' office, would not be

AO 72A
(Rev. 8/82)

a reasonable substitute for one sold to an acute care provider.
See Aquatherm Indus., Inc., 971 F. Supp. at 1426 (relevant
product market must include available substitutes).  For
example, "[t]here is not a single fact alleged to suggest that
if a box of [Defendant's] syringes intended for a nursing home
was misdelivered to [Plaintiffs], those syringes could not be
used to care for [Plaintiffs'] patients, or vice versa."  Dkt.
No. 31, pp. 14-15.  In leaving out certain purchasers of
hypodermic syringes and IV catheters, Plaintiffs' averments
sweep far short of the outer boundaries of the markets for the
sales of these products.

Moreover, Plaintiffs' Complaint fails to plausibly
demonstrate that the portion of purchasers identified—acute care
providers—make up a distinct submarket within each of the
broader markets for hypodermic-syringe and IV catheter sales.
The Complaint is devoid of any facts suggesting that the
industry or general public recognizes the sales of syringes or
IV catheters to acute care providers as a discrete market.  See
Jacobs, 626 F.3d at 1337 (practical indicia of the existence of
a submarket include industry or public recognition).  There are
also no facts indicating that the syringes and IV catheters sold
to acute care providers are peculiar in terms of their function,
use, production process, price, or method of distribution.  See
id. (practical indicia also include a "product's peculiar

AO 72A
(Rev. 8/82)

characteristics and uses, unique production

facilities . . . distinct prices, sensitivity to price changes,

and specialized vendors"). Rather, the only conceivable basis

for Plaintiffs' attempt to narrow the general syringe and

IV catheter markets is that acute care providers constitute

"distinct customers," see id., though even this proposition

lacks any plausible basis in the Complaint.

While a relevant market can consist of only some of the

purchasers of a broadly defined product, it is the nature of the

more specific product—not the nature of the purchasers—that

makes narrowing the market to these distinct purchasers

appropriate. See Lockheed Martin Corp., 314 F. Supp. 2d at 1226

(citing T. Harris Young & Assocs., Inc. v. Marquette Elecs.,

Inc., 931 F.2d 816, 824-25 (11th Cir. 1991)). In T. Harris

Young, the plaintiff brought antitrust claims against a

manufacturer of recording paper used in electrocardiograph

("EKG") machines. 931 F.2d at 819. In attempting to define the

relevant product market, the plaintiff included only "hospitals

with 200 or more beds," even though the manufacturer sold

identical EKG recording paper to smaller customers as well. Id.

at 820. The Eleventh Circuit Court of Appeals affirmed the

district court's finding that the plaintiff failed to establish

the product dimension of the relevant market, because it did not

show that the EKG recording paper used by hospitals with 200 or

more beds was any different from the paper used by smaller

hospitals, clinics, and doctors' offices. Id. at 825. The

Eleventh Circuit explained its ruling as follows:

> While a relevant product market can be limited to a
> portion of customers, such a limitation must be based
> on a distinction in the product sold to those
> customers. If, for example, a product is specially
> designed for a certain group of purchasers and the
> suppliers concentrate their efforts almost exclusively
> on those purchasers, as in Heatransfer, the product
> dimension may be limited to the sale of that product
> to those purchasers. Similarly, where one product is
> distinct from another because of its salability, as in
> International Boxing Club of New York, Inc. v. United
> States, the relevant market can consist solely of that
> product.

Id. at 824-25 (citations omitted) (citing Int'l Boxing Club of

N.Y., Inc. v. United States, 358 U.S. 242, 242 (1959), and

Heatransfer Corp. v. Volkswagenwerk, A.G., 553 F.2d 964, 964

(5th Cir. 1977)).

In Heatransfer, an antitrust suit involving the sale of

automobile air conditioners, the plaintiff limited the relevant

market to air conditioners sold for use in imported Volkswagen

automobiles, as opposed to those sold for use in all vehicles.

553 F.2d at 980. The Court of Appeals for the Fifth Circuit

affirmed the jury's finding that the plaintiff properly narrowed

the relevant product market to only these distinct purchasers.

Id. at 981.[12] The Court reasoned that "the distinct engineering

---

[12] In Bonner v. City of Prichard, the Eleventh Circuit Court of
Appeals adopted as binding precedent all decisions of the former Fifth

problems associated with the Volkswagen imports" distinguished the air conditioners marketed to Volkswagen importers from those marketed to other customers. Id. at 980. Further, the Court observed that the manufacturers of the air conditioners used in Volkswagen imports concentrated their sales efforts primarily on this group of customers. Id.

International Boxing involved antitrust claims defining the relevant product market as the market for the promotion of championship boxing contests, rather than professional boxing contests generally. 358 U.S. at 250. The Supreme Court upheld the lower court's determination that the relevant product market was appropriately limited to championship boxing contests, based on detailed findings regarding the salability of the championship events. Id. at 250-51. Specifically, the Court remarked that the "particular and special demand" for championship fights was such that the nonchampionship events were not "reasonably interchangeable for the same purposes" as the championship contests. Id. at 251.

Plaintiffs' Complaint presents circumstances that are more similar to those in T. Harris Young than those in Heatransfer and International Boxing. As discussed supra, Plaintiffs do not allege that the hypodermic syringes and IV catheters used by

_____

Circuit handed down prior to October 1, 1981. 661 F.2d 1206, 1207 (11th Cir. 1981).

AO 72A
(Rev. 8/82)

acute care providers are any different from those used by other healthcare providers. See <u>T. Harris Young</u>, 931 F.2d at 825. Nor do Plaintiffs contend that Defendant and its competitors specially design syringes and IV catheters for acute care providers and focus their sales efforts on the same, <u>cf.</u> <u>Heatransfer</u>, 553 F.2d at 980-81, or that the syringes and IV catheters sold to acute care providers differ in terms of salability from those sold to other providers, <u>cf.</u> <u>Int'l Boxing</u>, 358 U.S. at 250-51. If the Complaint were to allege that the products sold to acute care providers were distinct in any of these ways, then the Court would have to accept those facts as true at this stage and could perhaps find that Plaintiffs sufficiently defined the relevant markets for the sales of syringes and IV catheters. However, because Plaintiffs' Complaint limits the markets to only a select group of customers, without even remotely identifying a difference in the products supplied to those customers, the Complaint fails to properly define the relevant product markets, as required to state a plausible monopolization claim.

Plaintiffs nevertheless urge the Court not to dismiss their claims on this basis. See Dkt. No. 28, p. 7 n.2 ("A court should not dismiss a complaint for failure to allege a relevant market 'unless it is apparent from the face of the complaint that the alleged market suffers a fatal legal defect.'" (quoting

AO 72A
(Rev. 8/82)

Newcal Indus., Inc. v. Ikon Office Solution, 513 F.3d 1038, 1045 (9th Cir. 2008))). The Court recognizes that the scope of the relevant market is an issue of fact, U.S. Anchor Mfg., Inc., 7 F.3d at 994, and that the fact-intensive nature of antitrust cases counsels against their dismissal, Covad Commc'ns Co. v. BellSouth Corp., 299 F.3d 1272, 1279 (11th Cir. 2002). However, where, as here, plaintiffs "allege[] a proposed relevant market that clearly does not encompass all interchangeable substitute products even when all factual inferences are granted in plaintiff['s] favor, [the] relevant market is legally insufficient and a motion to dismiss may be granted." JES Props., Inc. v. USA Equestrian, Inc., 253 F. Supp. 2d 1273, 1282 (M.D. Fla. 2003) (citing Queen City Pizza v. Domino's Pizza, Inc., 124 F.3d 430, 436 (3d Cir. 1997)). In other words, even if Plaintiffs were able to prove the facts alleged, it would not support a finding of monopolization.

Because dismissal is appropriate on this basis, the Court need not reach Defendant's additional arguments concerning the legal sufficiency of Plaintiffs' monopolization claims. See Dkt. No. 9, pp. 16-22. This portion of Defendant's Motion to Dismiss is **GRANTED**.

## CONCLUSION

As noted herein, the Court **GRANTED** Defendant's Oral Motion for a Hearing (dkt. no. 20) on the record at the December 3, 2015, motion hearing. Dkt. No. 42, 4:2-4. Because this Motion appears to remain pending upon the docket of this case, the Clerk of Court is **DIRECTED** to update the docket to reflect this ruling.

Additionally, for the reasons set forth above, Defendant's Motion to Dismiss (dkt. no. 9) is **GRANTED** in its entirety. The Clerk of Court is **DIRECTED** to enter the appropriate judgment of dismissal and to close this case.

**SO ORDERED**, this 29TH day of January, 2016.

LISA GODBEY WOOD, CHIEF JUDGE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA

AO 72A
(Rev. 8/82)